**In re Stephanie A. CHEEK, Debtor.**

**E. Rebecca CASE, Trustee; Mercantile Bank of St. Louis, National Association; Cowen & Company, Plaintiffs,**

v.

**Stephanie A. CHEEK, Debtor–Defendant.**

**Bankruptcy No. 91–42453–293.**
**Adv. Nos. 91–4414, 91–4410 and 91–4413.**

United States Bankruptcy Court,
E.D. Missouri, E.D.

July 26, 1993.

As Amended July 28, 1993.

---

9. The bankruptcy court is staying its judgment pending the Court's decision on the motion for withdrawal of reference.

Charles S. Kramer, Clayton, MO, for trustee.

E. Rebecca Case, St. Louis, MO, trustee.

Mark V. Bossi, St. Louis, MO, for Mercantile.

Donald J. Mehan, Clayton, MO, for Cowen & Co.

## MEMORANDUM OPINION

DAVID P. McDONALD, Bankruptcy Judge.

### JURISDICTION

This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151, and 157 and Local Rule 29 of the United States District Court for the Eastern District of Missouri. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(J), which the Court may hear and determine.

### PROCEDURAL BACKGROUND

(1) On April 12, 1991, Mrs. Cheek's creditors filed an involuntary petition of bankruptcy against her.[1]

(2) Mrs. Cheek, on May 14, 1991, consented to the entry of an order for relief under Chapter 7.

(3) The Court, in separate orders, extended the deadline to file objections to discharge under section 727 of the Bankruptcy Code and/or any complaints as to the dischargeability of specific debts under section 523 of the Bankruptcy Code until October 22, 1991 for the Trustee, Mercantile Bank of Saint Louis National Association (Mercantile), American Bank of Saint

---

1. These same creditors simultaneously filed an involuntary petition of bankruptcy against Mrs. Cheek's husband, Malcolm Cheek. Upon the motion of the Trustee appointed in Mrs. Cheek's case, the Court, on April 8, 1992, substantively consolidated the Cheeks' cases.

Louis, Allegiant Bank, Allegiant State Bank, Cowen & Co., and Landmark Bank.[2]

(4) On August 30, 1991, Debtor amended her schedule of personal property as follows:

(a) Debtor changed her estimate of the value of her interests in the stock of Y & A Group, Inc. from $398,084.00 to $0.00;

(b) Debtor added her interests in Cheek & Garber P.C. and CDWW, Inc. to her schedules and valued her interest in both ventures as $0.00;

(c) Debtor suggested that she had an interest in at least one insurance policy but indicated that she did not believe any policies in which she possessed interests had any surrender or refund value; and

(d) Debtor added more than $7,700.00 to her list of deposits with banking institutions.[3]

(5) On October 21, 1991, Mercantile filed a six-count complaint objecting under section 727 of the Bankruptcy Code to Debtor's discharge. Mercantile alleged that:

(a) "Debtor with the intent to hinder and delay or defraud her creditors (including Mercantile) transferred, removed and/or concealed, and/or permitted to be transferred, removed and/or concealed, property of the Debtor within one year before the date of the filing of the Petition, including, but not limited to, certain items of personal property which were previously located at the premises commonly known as 13326 Buckland Hall Road, St. Louis, Missouri;"

(b) "Debtor with the intent to hinder and delay or defraud her creditors (including Mercantile) transferred, removed and/or concealed, and/or permitted to be transferred, removed and/or concealed, property of the estate after the date of the filing of the Petition, including, but not limited to, certain items of personal property which were previously located at the premises commonly known as 13326 Buckland Hall Road, St. Louis, Missouri;"

(c) "[D]uring the pendency of the above-captioned Chapter 7 case, Debtor has unjustifiably concealed, destroyed and/or failed to keep and preserve recorded information from which her financial condition and business transactions might be ascertained including, but not limited to, certain checks, check registers, bank statements and brokerage account statements;"

(d) "Debtor has made numerous false oaths and accounts including, but not limited to, false oaths and accounts in her schedules and statements of financial affairs, in the first meeting of creditors held pursuant to 11 U.S.C. § 341, and in a Rule 2004 examination conducted on June 25, 1991;"

(e) "[D]uring the pendency of the above-captioned Chapter 7 case, Debtor has withheld from the duly appointed Chapter 11 (sic) Trustee recorded information relating to her property and financial affairs, including but not limited to certain checks, check registers, bank statements and brokerage account statements;"[4] and

(f) "Debtor has failed to explain satisfactorily a significant loss and deficiency of assets to meet her liabilities."

(6) Cowen & Co., on October 22, 1991, filed an adversary complaint echoing many of the concerns raised by Mercantile's complaint and challenging the dischargeability of the debt owed to it on section 523 grounds.[5]

---

**2.** The Court extended the deadline for filing objections to discharge until August 29, 1991 for all other creditors.

**3.** Debtor claimed she was initially confused as to which date the schedules referred. She maintained she had initially completed the schedules to reflect her financial position on the day she completed them rather than April 12, 1991, the day her creditors filed the involuntary bankruptcy petition against her. Debtor was represented by counsel when she completed her first set of schedules.

**4.** Mercantile later asked the Court to dismiss, with prejudice, this Count of its Complaint.

**5.** This opinion addresses only those challenges to Debtor's discharge arising under section 727 of the Bankruptcy Code. The complaint Cowen & Co. filed asked the Court for three forms of relief. In addition to seeking relief based on

(7) E. Rebecca Case, the Trustee appointed by the Court in this case, filed an adversary proceeding on October 22, 1991. Case, like Mercantile, asserted that the Court should deny Debtor a discharge under section 727 because she had, among other acts, allegedly:

(a) "with intent to hinder, delay, or defraud, transferred, destroyed or concealed property, and/or allowed, authorized and permitted such property [her property which would have been property of the estate] to be transferred, destroyed or concealed, both within one year prior to the filing of the Petition and after the filing of the Petition;"

(b) "concealed, falsified or failed to preserve records from which the Debtors' financial condition would have been more accurately ascertained;"

(c) "knowingly and fraudulently made false oaths and claims regarding information relating to the Debtor's affairs;" and

(d) "repeatedly failed to satisfactorily explain various losses and deficiencies of assets." [6]

(8) Debtor filed separate but similar answers to each party's adversary complaint. In these answers, Mrs. Cheek maintained that:

(a) her husband had controlled their finances throughout the course of their seventeen-year marriage and that he had kept all their financial records;

(b) by producing all the financial records she had found and by requesting that various others provide records to the trustee, she had fulfilled her duty to maintain, preserve, and provide recorded information indicating her financial position;

sections 727 and 523 of the Bankruptcy Code, Cowen & Company's complaint requested the entry of a money judgement against Mrs. Cheek in the amount of $141,166.51. The Court will not enter a money judgement against the Debtor in these proceedings as it views that request as a part of Cowen & Company's 523 action and not a part of its claim asserted under section 727.

(c) at her husband's instruction she had often signed her name to legal documents and checks without comprehending either what she was signing or the consequences of her signature;

(d) she and her husband were solvent prior to March of 1991 and she had neither planned her bankruptcy nor removed, transferred or concealed assets in the year prior to the filing;

(e) at all times she had been truthful with her creditors and the trustee and had not knowingly and fraudulently made false oaths;

(f) she routinely gave gifts of furniture and personalty to relatives and others;

(g) while she was in Atlanta assisting her daughter-in-law through a difficult pregnancy in January and February of 1991, her husband, Malcolm, sold many of their possessions and used the proceeds of these sales in his business;

(h) though Debtor knew generally of her husband's need and plans to sell their personal property to raise funds for his business, she did not participate in those sales and did not know the details of those transactions;

(i) her husband's sales of personal property satisfactorily explained any loss or deficiency of assets the plaintiffs in the various adversary proceedings alleged; and

(j) she had not removed, transferred, or concealed estate assets after filing bankruptcy; [7]

(9) The Plaintiffs agreed to consolidate their 727 adversary complaints for a single trial.

---

**6.** Trustee Case's Complaint, unlike Mercantile's, included a non-exclusive list of thirty-six items to which her allegations of concealment, destruction, failure to satisfactorily explain loss of, etc. applied.

**7.** Debtor acknowledged that she, with the Trustee's permission, had removed a few personal items from her home following the filing of the Petition.

## FACTUAL BACKGROUND

After considering the evidence adduced at trial and the record as a whole, the Court makes the following findings of fact:

(1) Malcolm Cheek, Debtor's husband, formerly served as the President and Chief Executive Officer of Y & A Group, Inc., a now-defunct engineering concern.[8]

(2) For many years Mr. Cheek worked long hours, often 15 hour days, seven days a week. In addition to conducting his business affairs, Mr. Cheek controlled his and Stephanie's finances. Mr. Cheek constantly shifted the couple's money from one account they maintained to another. Malcolm instructed his wife which bills to pay, when to pay those bills and from which account she was to write the check to pay a given bill. Once, Debtor wrote a check to pay a bill without consulting her husband and he became very upset with her and told her not to ever pay a bill without consulting him because only he knew where their money was at any point in time.

(3) The Cheeks had two sons, Malcolm A. Cheek (MAC) and Benjamin Cheek. MAC, age 24 in 1991, worked for Y & A Group from the summer of 1988 until December of 1990. MAC left Y & A Group to work for Tri–Concepts Inc., another Malcolm Cheek venture. When this case was filed, Benjamin Cheek was a minor and a dependant of the Debtor.

(4) In 1983, Debtor obtained her Missouri Real Estate Broker's license and later procured real estate licenses in Illinois and Florida. For a time she worked with Y & A Realty Group, a company affiliated with her husband's enterprise, where she helped locate homes for employees of Y & A Group. While working with Y & A Realty, Debtor sold homes to two Y & A Group employees.

(5) Mrs. Cheek graduated from Saint Louis University School of Law in May of 1990 and founded Cheek and Garber P.C.

where she practiced law, from October 1990 until March 1991.[9]

(6) The Cheeks began building a custom home at 13326 Buckland Hall Road (herein referred to as Buckland Hall) in August of 1989. The construction costs of Buckland Hall totalled approximately $1.55 million.

(7) The Cheeks's 1990 Federal Income Tax return shows they earned a combined gross income for the year of $151,049.00 but paid personal interest exceeding $238,-000.00 and paid mortgage interest of $89,-295.00. Debtor explained that she and her husband funded this deficit by borrowing against Malcolm's millions of dollars worth of stock in Y & A Group.

(8) Malcolm Cheek disappeared on March 4, 1991 after travelling to New York City from Atlanta, Georgia.

(9) On March 15, 1991, nearly a month before her creditors filed their involuntary petition of bankruptcy against her, Mrs. Cheek paid Scott Greenberg, her original bankruptcy counsel, $7,500.00. Mr. Greenberg later withdrew as her attorney and she represented herself thereafter.

(10) By orders of this Court dated July 19, 1991 and October 4, 1991, Atec Liquidations, Inc. was authorized to sell personal property of the bankruptcy estate in this case.

(11) Debtor's mother, Catherine Capps, stated in her deposition that a few months before Malcolm disappeared, Stephanie told her that she and Malcolm were going to sell their interest in Y & A Group and their home, Buckland Hall. Mrs. Capps further testified that the Debtor told her, in January of 1991, that she and Malcolm were going to sell their oriental rugs.

(12) Since her creditors filed the involuntary petition of bankruptcy against her, Debtor has lived with her family in Georgia. She first lived with her son MAC and his wife Debi and then she moved in with her sister Heidi Harnish and her husband

---

**8.** Malcolm Cheek disappeared in March of 1991. His last known destination was New York City.

**9.** Debtor's schedules originally indicated that she had practiced law with Cheek & Garber,

P.C. from July of 1990 until March of 1991. Mrs. Cheek testified that this was a typographical error, for she did not pass her first bar exam until October of 1990.

Brad. The parties stipulated at trial that Debtor's sole source of income is the gifts of cash her son MAC gives her.

(13) Plaintiffs in these proceedings presented testimony from various suppliers and retailers who had sold to the Cheeks furnishings and fixtures for Buckland Hall. These witnesses compared the invoices and bills of sale reflecting what they had sold to the Cheeks with the furnishings and fixtures they observed upon either walking through the home after the Trustee took possession of it and/or viewing the home and its contents in a set of photographs and a videotape both of which depicted the home and its contents after the Trustee took possession of it. This testimony indicated that many fixtures and pieces of personalty were sold to the Cheeks but absent from Buckland Hall on May 22, 1991, the day the Trustee took possession of the house and its contents.

Ted Lammert of Lammert Furniture Company testified that Stephanie and/or Malcolm Cheek purchased the following items and indicated whether he observed them in the house: [10]

| Date | Item | Cost | Observed | Sold by Atec |
|---|---|---|---|---|
| 12/13/90 | Bob White Quail | $ 99.00 | No | No |
| 12/13/90 | Ringneck Pheasant Jumping | $ 289.00 | No | No |
| 12/13/90 | Aspen Mullin Spices | $ 11.96 | No | No |
| 12/13/90 | Ringneck Pheasant Standing | $ 289.00 | Yes | Yes* |
| 11/7/90 | Christmas 1990 Chair | $ 433.00 | No | No |
| 10/29/90 | Renaissance China | $ 465.60 | No | No |
| 8/9/90 | Baker Ottoman | $1,098.30 | No | No |
| 7/12/90 | Hickory Chair, Leather | $ 909.00 | No | No |
| 7/12/90 | Hickory Loveseat, Leather | $2,491.00 | No | No |
| 7/12/90 | Hickory Ottoman, Leather | $ 643.00 | No | No |
| 8/2/90 | Baker Chest | $1,459.00 | No | No |
| 6/17/90 | Century Ottoman (2) | $1,216.00 | No | No |
| 5/2/90 | Chairs (2) | $3,428.60 | No | No |
| 5/31/90 | Baker China Cabinet | $2,749.00 | Yes | Yes* |
| 5/31/90 | Baker Desk | $4,549.00 | No | No |
| 5/14/90 | Sly Credenza | $2,323.00 | No | No |
| 5/14/90 | Sly Desk | $2,708.00 | No | No |
| 5/14/90 | Sly Filing Cabinet | $1,434.00 | No | No |
| 5/2/90 | Silk Yellow Sofa | $3,169.00 | Yes | Yes* |
| 4/23/90 | Sofa | $1,319.00 | No | No |
| 4/23/90 | Baker Extension Table | $1,809.00 | No | No |
| 4/22/90 | Century Leather Sofa | $2,681.40 | No | No |
| 4/22/90 | Century Leather Loveseat (2) | $4,198.80 | No | No |
| 4/22/90 | Century Leather Chair (2) | $2,878.80 | No | No |
| 4/22/90 | Century Leather Ottoman (2) | $1,042.80 | No | No |
| 4/23/90 | Blended Blue Silk Tassel | $ 21.95 | No | No |
| 8/2/90 | Lacquer Stand | $ 779.00 | No | No |

Certain items listed above were not observed by Mr. Lammert because the Debtor exempted the Sly Filing Cabinet from the estate and the following items were previously sold by Malcolm Cheek to their son MAC:

10. Mr. Ted Lammert is Vice President of Lammert Furniture Company and runs the wholesale division of the company. He has been Vice President for four years and has worked for the company for eight years during which time he has held several positions. In arriving at his conclusion as to whether or not he observed certain items, he had the opportunity to view photographs and a videotape of the house.

Sly Credenza

Sly Desk

One Century Leather Loveseat

One Century Leather Chair

Mr. Steven Patton, co-owner of Frank Patton Interiors, testified that Stephanie and/or Malcolm Cheek purchased the following items and indicated whether he observed them in the house: [11]

| Date | Item | Cost | Observed | Sold by Atec |
|------|------|------|----------|--------------|
| 10/21/89 | J. Widdicomb Mario Buatta Coffee Table | $ 1,540.00 | No | No |
| 11/13/89 | J. Widdicomb Console Table | $ 1,555.20 | No | No |
| 11/13/89 | J. Widdicomb End Table | $ 552.96 | No | No |
| 11/13/89 | M. Smith Rev. Library Table | $ 301.00 | No | No |
| 11/13/89 | Kindell Clock Hamilton | $ 4,899.30 | No | No |
| 11/13/89 | Century British Trust Bed | $ 4,899.30 | No | No |
| 11/13/89 | British Nat'l Trust Brkfst. | $ 1,995.00 | No | No |
| 11/13/89 | Leather Chair & Ottoman | $ 1,767.50 | No | No |
| 11/13/89 | Jasper Desk | $ 810.00 | No | No |
| 11/13/89 | Kindell Rhode Island Desk | $13,311.60 | No | No |
| 11/13/89 | Hekman Entertainment Center | $ 2,449.30 | No | No |
| 11/13/89 | Kindel Philadelphia Pie Crust Table | $ 2,783.00 | No | No |
| 11/13/89 | Side Chairs (8) | $ 8,496.00 | Yes | Yes |
| 4/25/90 | Classic Leather Arm Chair (2) | $ 962.50 | No | No |
| 4/26/90 | Widdicomb Coffee Table | $ 1,075.20 | No | No |
| 4/26/90 | Widdicomb James Ottoman | $ 1,519.00 | No | No |
| 4/26/90 | Port Royal Tole Lamp | $ 455.00 | No | No |
| 4/26/90 | Harden Signature Sofa | $ 3,712.80 | Yes | Yes |
| 4/26/90 | Knob Creek Table Lamp | $ 315.00 | No | No |
| 4/26/90 | LaBarge Mirror (Dining Room) | $ 1,111.60 | Yes | Unknown |
| 4/26/90 | Widdicomb Pedestal | $ 1,193.50 | No | No |
| 4/26/90 | Kindel Sideboard (Dining Rm) | $ 2,409.40 | Yes | Yes* |
| 4/26/90 | Hickory White Chest (2) | $ 1,852.20 | No | No |
| 4/28/90 | Widdicomb Mario Buatta Chair | $ 1,740.00 | No | No |
| 4/28/90 | Kindel Pedestal Table (Dining Room) | $ 3,229.10 | Yes | Yes* |
| 5/07/90 | Hekman Credenza | $ 2,274.30 | No | No |
| 6/15/90 | Mottahedeh Double Dog Candlestick (2) | $ 264.00 | No | No |
| 6/15/90 | Mottahedeh Blue and White Candlestick | $ 120.00 | No | No |
| 6/15/90 | Mottahedeh Blue and White Soap Dish | $ 32.00 | No | No |
| 6/15/90 | J. Widdicomb Etagere Table | $ 1,113.00 | No | No |
| 6/16/90 | Wellington Hall Console | $ 909.30 | No | No |
| 6/16/90 | J. Widdicomb Mario Buatta Table | $ 1,995.00 | No | No |
| 6/20/90 | Chelsea House Trumean Oil Painting Floral Mirror | $ 640.00 | No | No |
| 8/01/90 | Mattahedeh Epergne | $ 430.50 | No | No |
| 8/01/90 | Port Royal Empire Canton Shelf | $ 350.00 | No | No |
| 8/01/90 | Port Royal Chinese Chippendale Shelf | $ 691.25 | No | No |
| 8/01/90 | M. Smith Oval Table | $ 301.00 | No | No |
| 8/01/90 | Hickory White Chair (2) | $ 2,878.40 | No | No |

11. Mr. Patton has been a co-owner of Frank Patton Interiors for five years. Before becoming a co-owner, he held various positions of management with the company. He has 16½ years of experience in the furniture business. In arriving at his conclusion as to whether he observed certain items, he had the opportunity to view photographs and a video tape and walk through the house at 13326 Buckland Hall Road.

| Date | Item | Cost | Observed | Sold by Atec |
|------|------|------|----------|--------------|
| 8/01/90 | Hickory White Bench | $ 409.50 | No | No |
| 8/01/90 | Kelvin Chen Large Bird Cage | $ 76.30 | No | No |
| 8/02/90 | Port Royal Oval/Oak Leaf Mirror | $ 868.00 | No | No |
| 8/02/90 | Mottahedeh Brass Tray | $ 15.40 | No | No |
| 9/14/90 | Harden Rocker | $ 399.00 | Yes | Yes* |
| 9/14/90 | Harden Child's Rocker | $ 199.00 | Yes | Yes* |
| 10/15/90 | Maitland Smith Waste Bin | $ 301.00 | No | No |
| 10/15/90 | Maitland Smith Leather Bookcase | $ 1,226.40 | No | No |
| 11/19/90 | Mattahedeh Blue Canton Coasters (3) | $ 115.50 | No | No |
| 11/19/90 | Maitland Smith Leather Trunk | $ 1,399.00 | No | No |
| 12/07/90 | Widdicomb Mario Buatta Revolving Bookcase | $ 1,750.00 | No | No |
| 12/07/90 | Mottahedeh Medium Cross Dish | $ 77.00 | No | No |
| 12/07/90 | Port Royal Monkey Vocalist | $ 290.50 | No | No |
| 12/07/90 | Port Royal Monkey Violinist | $ 306.60 | No | No |
| 12/07/90 | Port Royal Monkey Bassist | $ 306.60 | No | No |
| 12/07/90 | Port Royal Monkey Conductor | $ 297.50 | No | No |
| 12/07/90 | Port Royal Stand | $ 52.50 | No | No |

* In some instances, the Auction Report description is somewhat vague but the item appears to be the one described (i.e., Harden Rocker and Harden Child's Rocker shown on Auction Report as large rocker and small rocker). In those cases, the Court gave the benefit of the doubt to the Debtor and assumed the item was sold.

Although the following items were not observed by Mr. Patton, Mrs. Cheek was able to observe them in the photographs and/or videotape:

Two Mottahedeh Blue and White Candlesticks

Wellington Hall Console

Chelsea House Trumean Oil Painting Floral Mirror

Kelvin Chen Large Bird Cage

Port Royal Oval/Oak Leaf Mirror

(14) Mr. John Simpson of Atec Liquidations, Inc.[12] testified that the Auction Report, Plaintiff's Exhibit 13, is a true and accurate list of everything that was sold at auction. The videotape referred to was made by Mr. Jim Bay, an employee of Atec, with the assistance of Joan Calcagnon, also an employee of Atec, and is a true and correct portrayal of all the property removed from Buckland Hall and auctioned. Mr. Simpson testified that Atec sold all of Buckland Hall's furnishings and contents except:

(1) a computer which was reclaimed by a bank;

(2) two rockers identified by Steve Patton of Frank Patton Interiors which were auctioned but reclaimed by Mrs. Cheek, so they were not actually sold;

(3) a phone system; and

(4) light fixtures.

He further testified that none of the items on the invoices from Frank Patton Interiors that Steven Patton identified as "missing" were in the Buckland Hall residence when Atec first visited the house and none were sold by Atec at the auction. He also testified that none of the items on the invoices of Lammert Furniture which Ted Lammert identified as "missing" were in the Buckland Hall residence when Atec first visited the house and that none of these items were sold by Atec. He testified that Atec sold no Waterford vases, no quilts, no Wildwood lamps and no dictionary stand. Some vases and some lamps

12. Mr. Simpson works as an appraiser, chief auctioneer and salesman with Atec Liquidations, Inc., the court-appointed auctioneers in this case.

were sold at the auction, but he did not know the brand names. Unfortunately, the auctioneer's list was written in general terms and failed to provide detailed descriptions of each item sold.

(15) The testimony of the Trustee, Debtor and/or John Simpson, the court-appointed auctioneer who conducted the sale of the property found in Buckland Hall, along with the documents the Plaintiffs introduced into evidence, proved that the following items of property were "missing" [13] from Buckland Hall when the trustee took possession of the estate:

an eight place-setting collection of Mottahedeh China [14]; a ten place-setting set of silverware purchased at Fortunoff's in New York for $6,800.00 [15]; a 14″ vase Mrs. Cheek purchased for $1,371.66 at the Waterford/Wedgewood store in Plaza Frontenac [16]; a grandfather clock; decorative spears and masks; a number of quilts; framed maps (antique map collection); a porcelain garden seat; a Victorian vase; twelve hat boxes each valued at $1,000.00; a Maryland Classic dictionary stand purchased for $480.20; two puppets from Thailand; various pieces of decorative pottery; a zebra skin rug; a Hummel nativity scene; a Rolex woman's watch purchased at Bailey Banks & Biddle for $12,893.19.

(16) Though she could not prove that the following items were "missing" from Buckland Hall because she could not prove that the Cheeks had ever owned them, the trustee testified that the home lacked common household items of necessity such as an ironing board; extra sheets; a coffee pot; a mixer; any towels; any China (besides a set of dishes used for decoration which had been purchased from J.C. Penney); any nice pots or pans; any ties; any men's white dress shirts; or any shoes to go in the 87 empty women's shoe boxes she found.

(17) In her schedules, Debtor alluded to various transfers of personal property by her husband. Through her testimony Debtor explained that her husband had told her that to finance Y & A Group Inc., he would have to sell some of their personalty including their furniture and oriental rugs and her jewelry and Mercedes.

(18) Mrs. Cheek testified that Malcolm sold any "missing" property to raise funds for his business, that he did this when she was out of town in January and February of 1991 and that she lacked any knowledge of the specific transactions involved. Mrs. Cheek did not know when during January and February of 1991 she was in Saint Louis and when she was not as she frequently travelled between Saint Louis and Atlanta during that time.

(19) The Plaintiffs entered into evidence calendars (that they compiled from credit card receipts and frequent flier logs) depicting the whereabouts of Mr. and Mrs. Cheek in January and February of 1991. These calendars showed that in that two-month span, Malcolm was in Saint Louis for only seven to ten days [17] when Stephanie was out of town.[18]

---

**13.** The Court uses the term missing in the sense that the Plaintiffs demonstrated that the Cheeks purchased or at one time owned these items which the Plaintiffs also established were not present among the property of the estate.

**14.** Debtor testified that at her husband's request she had packed-up this China. She claimed to have last seen it where she left it in the basement of Buckland Hall.

**15.** Debtor testified that this set of silver had never been used or unpacked and that she had last seen it in a closet in the front hallway of Buckland Hall. Debtor also testified at trial that Malcolm did not discuss selling the silver with her but in her 341 meeting she stated that Malcolm had told her he was planning to sell it.

**16.** Debtor testified that this must have been sold at the trustee's auction of property from Buckland Hall. The trustee and the auctioneer testified to the contrary.

**17.** These numbers reflect the fact that on five days in January and two days in February, the records indicate that Mr. Cheek was in Saint Louis for only part of the day.

**18.** The calendars also show 15 days in January on which Malcolm was in Saint Louis and one cannot determine where Stephanie was. February shows nine such days. Therefore, Malcolm might have been in Saint Louis for as many as 34 days during January and February when Stephanie was not in the city.

(20) Senka Meek worked as the Cheeks's housekeeper, three eight-hour days a week, from approximately May of 1990 through the end of January 1991. She first learned of her termination on the day she was let go. Stephanie Cheek told Ms. Meek they were moving due to Malcolm's health and her services were no longer needed. Ms. Meek did not notice any replacement or substitution of furniture or fixtures in Buckland Hall through the entire time she worked for the Cheeks. She also testified that Heidi Harnish stored furniture in the Cheeks's basement after she had moved out of her own house. She also testified that Malcolm was rarely at the house, because he worked all the time.

(21) The parties stipulated at trial that the Debtor has turned over to the trustee all the records she possesses regarding her financial situation.

(22) Debtor received approximately $460.00 as a post-petition refund from Riverside Military Academy, the military academy her youngest son, Benjamin, had attended. Mrs. Cheek did not turn this check or the proceeds from it over to the estate. Debtor testified that she did not recall receiving this check but said that if she had she would have deposited it in her account at Bank South.

(23) Debtor received two income tax refund checks, post-petition, one for approximately $7,000.00 on April 11, 1991 and another for approximately $8,000.00 on April 17, 1991, which she listed on her schedules. She deposited these checks in an account at Bank South on April 11th and 17th, respectively.

(24) On March 7, 1991, three days after her husband disappeared, Debtor, upon the alleged advice of an attorney in New York[19], withdrew $14,000.00 from her account at Bank South in two transactions, one of $9,000.00 and another of $5,000.00. Mrs. Cheek testified that she used this money to pay living expenses for herself and her dependant son and/or her attorney's fees. Debtor maintained she redeposited $6,857.00 of these withdrawn funds.

(25) On the date Debtor's creditors filed their involuntary petition of bankruptcy against her, Mrs. Cheek's account at Bank South held more than $9,000.00. By May 20, 1991, the balance in this account had dropped below zero to − $13.83. After originally scheduling this account's balance at $100.00, Debtor amended her schedules to show that her Bank South account held $8,072.90 on April 12, 1991. These funds were never turned over to the estate; instead, Debtor applied them to her monthly bills, her living expenses, her credit card debt and her student-loan debt.

(26) Tri–Concepts, Inc. assigned MAC to their Atlanta office in January of 1991. MAC and his wife, Debi, moved their belongings from their condominium in Creve Coeur, Missouri where they were living, to a residence in Alpharetta, Georgia on February 19–22, 1991.

(27) Malcolm Cheek sold MAC some furniture for use in his new office in Atlanta. A receipt Malcolm drafted indicated that MAC paid $2,000.00 cash[20] for furniture which Malcolm and Stephanie had purchased at various times within the prior year and one-half for almost $20,000.00.[21] This furniture was previously part of Buckland Hall's furnishings.

---

19. Debtor testified that she did not know the name of the attorney who advised her to withdraw these funds; she only knew he had been a business associate of her husband.

20. MAC, in deposition testimony which was introduced at trial, stated that he paid cash because his father needed the money for travelling. MAC, also in deposition testimony, explained that Malcolm drafted a receipt to evidence the transaction so that MAC could have Tri–Concepts reimburse him for the cost of these furnishings.

21. Mrs. Cheek testified that, on April 24, 1990, she and Malcolm purchased, for $5,031.00, the credenza and desk Malcolm sold to MAC. She also stated that the grey leather chair and love seat Malcolm sold to MAC had been purchased, in the summer of 1990 at a cost of $3,400.00. Debtor's further testimony indicated that the green sofa, love seat and two ottomans MAC bought from Malcolm were originally purchased in October of 1990 for a price of $10,801.80. Debtor could not recall the coffee table Malcolm sold to MAC.

(28) Mrs. Cheek testified at her examination held pursuant to Bankruptcy Rule of Procedure 2004, that Malcolm sold MAC enough furniture to fill the small living room in MAC's residence in Georgia. At trial Mrs. Cheek maintained that she had testified incorrectly but truthfully at the 2004 exam and had only learned after the exam that MAC had intended to use the furniture in his office in Georgia.

(29) A Personal Financial Statement dated September 14, 1990, containing the signatures of both Malcolm and Stephanie Cheek indicates that they owned "Other Personal Property rugs, artwork"[22] valued at $250,000.00.

(30) A receipt from the Asadorian Rug Company, Inc. (Asadorian Rug) shows that on May 24, 1990, "Mrs. Stephanie Cheek" purchased a "Fine Persian Kerman" rug for $6,143.00. A second receipt from Asadorian Rug dated June 29, 1990 shows that "Mr. and Mrs. Malcolm Cheek" purchased four fine rugs and a pad to fit one of them for $15,143.80. The trustee did not find any of these rugs when she took possession of Buckland Hall and its contents.

(31) Stephanie Cheek ordered a 12 × 28.5 ft. area rug from Advance Carpet Decorating Centers (Advance Carpet) on February 1, 1991. The invoice states "MUST MONDAY OR TUES. DELIV."[23] and says "HOT!" in the box marked "approx. [delivery] date." Another invoice also dated February 1, 1991 shows that Debtor ordered three more area rugs and, similarly, contains the notation "MUST MONDAY OR TUES. A.M. DELIV." in the area designated "special instructions."[24]

(32) Debtor also ordered two area rugs from Sun Carpet & Floor Centers (Sun Carpet) on February 1, 1991. The invoice evidencing this transaction contains the note "Customer wants A.S.A.P. stock color."

(33) Mrs. Cheek testified that she purchased the rugs from Advance Carpet and Sun Carpet to replace the fine rugs from Asadorian Rug that Malcolm had sold to raise money for his business. Debtor said her husband told her he was going to sell these rugs but she did not know to whom he sold them, how much money he received for them or when he sold them. Mrs. Cheek explained that she had to purchase the replacement rugs because she and her husband had put Buckland Hall on the market and could not show it to prospective buyers with bare floors.

(34) MAC rented a twenty-four foot truck, 24 furniture pads and a hand truck from a Ryder Truck rental outlet in Saint Louis on February 2, 1991; he returned the vehicle on February 3, 1991. MAC drove this rented truck a total of 49 miles.[25]

(35) The inventory prepared by the movers who transported the contents of MAC and Debi's Creve Coeur condominium to Alpharetta, Georgia shows that they shipped seven rugs (six of which were described as large) and two rug pads, all of which were rolled-up when the movers arrived at the residence.

(36) MAC stated in his deposition that he had one oriental rug in the condominium where he lived before marrying Debi and that they did not purchase any more when they moved to a house in Chesterfield, Missouri, which had wall to wall carpet.[26]

---

**22.** The Personal Financial Statement was a printed form and the words "rug, artwork" were typed additions to the pre-printed form.

**23.** Mrs. Cheek testified that she did not recall telling the salesperson that she needed the carpets soon and did not know what this note meant.

**24.** An invoice dated February 5, 1991 shows that Mrs. Cheek only received two of these three rugs and received a credit for the price of the one she did not receive.

**25.** Mrs. Cheek testified that it was a coincidence that she bought rugs to replace the fine oriental rugs in Buckland Hall on February 1, 1991 and that MAC rented a moving truck on February 2, 1991.

**26.** MAC lived in a condominium in Creve Coeur, Missouri before marrying Debi. The couple moved to a house in Chesterfield, Missouri and lived there briefly (four or five months) before moving back to the Creve Coeur condominium where they lived until they moved to Alpharetta, Georgia.

MAC also stated that he owned several throw rugs and carpet squares which he felt explained the inventory's count of seven rugs.

(37) Brad and Heidi Harnish moved from Chesterfield, Missouri to Alpharetta, Georgia on February 6, 1991. The Harnishes hired Ehmke Movers (Ehmke) to pack and ship their belongings. The Harnishes each testified in their depositions that Ehmke moved all their belongings to Georgia (except those items small enough to fit in their cars) and that the movers packed and shipped only the Harnishes' belongings. Mrs. Harnish emphasized that she was careful to let the movers move only her and Brad's possessions because she had obtained a price estimate before the move which was contingent upon the weight shipped. Both Mr. and Mrs. Harnish firmly denied that Brad had rented a Ryder or any other truck to assist them in moving their furniture to Georgia. However, Frank Payne, senior rental representative and operations representative of Ryder Truck Rental in St. Louis, testified that Brad Harnish, Debtor's brother-in-law, rented a twenty-four foot truck, 132 quilted furniture pads [27] (4′ × 6′) and a hand truck from a Ryder Truck rental outlet in Saint Louis on February 4, 1991. The rental agreement indicated Mr. Harnish would return the vehicle to a Ryder Truck rental outlet in Alpharetta, Georgia by February 8, 1991. In his deposition, Mr. Harnish denied ever renting a truck from Ryder or any other rental company. Mrs. Cheek testified that Mr. Harnish would have remembered renting the Ryder vehicle if the attorney who deposed him had confronted him with the rental receipt.[28]

(38) Heidi Harnish testified that the Ehmke movers picked up items from her and Brad's townhouse on February 5, 1991 and then picked up certain items she had stored at Buckland Hall [29] on February 6, 1991 before picking up a play set stored at her mother's home. While at Buckland Hall, the Ehmke movers also loaded the patio furniture Stephanie gave Heidi for her birthday aboard the truck and switched Heidi's leather furniture for some floral couches Stephanie had agreed to trade with her sister.

(39) Mrs. Cheek testified that she did not help Brad and Heidi move. Stephanie wrote a check for $76.00 to Ehmke on January 12, 1991. She could not recall why she had written this check but speculated at the trial that it was for packing materials for her sister. Debtor wrote a second check in the amount of $894.00 to Ehmke on February 6, 1991. The memo on this second check reads "add'l weight—Harnish." Debtor testified that the movers, having not previously examined all her sister's possessions, had miscalculated the weight of her sister's belongings and that she had written them a check for the extra weight because her sister was not present.

(40) In the Spring of 1990, Malcolm Cheek bought his wife a new Mercedes, model 300 SL, and titled it in her name. On January 13, 1991, Debtor executed a Special Power of Attorney empowering her brother-in-law, Brad Harnish to "sell, convey and transfer" title to her Mercedes.[30] Mr. Harnish drove Debtor's 300 SL to Florida and sold it to a dealer there for $64,-

---

27. The Ryder representative testified that furniture pads are used to protect fine furnishings, mirrors, art and other breakable items. He also testified that the use of 132 pads with a twenty-four foot truck suggested that few or no boxes were being used and that the load being moved consisted primarily of furniture because a 24 foot truck very rarely needs more than four dozen furniture pads.

28. Likewise, Heidi Harnish, Brad Harnish's wife and Stephanie Cheek's sister, testified that she and Brad drove to Atlanta in their two cars and that she did not recall them renting a Ryder or U-Haul truck.

29. Mrs. Harnish testified that she had stored various personalty at her sister's home after moving from a large home to a townhouse, including: a dining room set, six chairs, a large bench, some baby supplies, a stereo, a hutch, a desk, a washstand, her husband's desk and chair, a file cabinet, a pine wardrobe, a blanket chest, one or two dressers, a coffee table and various boxes of collectibles.

30. Mrs. Cheek testified that her husband had asked her to sign the Special Power of Attorney.

500.00.[31]  The Florida dealer drew his check, dated January 14, 1991, to the order of "Stephanie A. Cheek." Mrs. Cheek endorsed this check. Malcolm Cheek paid the expenses Brad Harnish incurred in driving to Florida as well as his air fare back to Saint Louis.

(41) Mrs. Cheek admitted to giving various pieces of patio furniture to her sister, Heidi Harnish, and to her daughter-in-law, Debi Cheek, shortly before they each moved to the Atlanta area in February of 1991. She claimed these represented their respective birthdays gifts, though Heidi's birthday is March 9 and Debi's is April 1. Mrs. Cheek explained that she gave them their furniture before their respective birthdays because she did not think it made sense to pay shipping charges to send these items to Heidi and Debi so soon after they had moved. Debtor also testified that for years she had given people gifts of used furniture and that in her mind these were ordinary gifts.

(42) Catherine Capps, Debtor's mother, stated in her deposition, portions of which were introduced at trial, that Malcolm and Stephanie never gave old or used items as gifts, at least not to her.

(43) Stephanie and her sister, Heidi Harnish, traded couches just before Heidi moved to the Atlanta area with her husband and daughter in February of 1991. In fact, the movers who shipped the Harnishes' belongings to Atlanta performed the furniture swap, bringing Heidi's leather couch set to Stephanie's home and exchanging it for two floral-print couches before continuing on to Atlanta. Debtor maintained that the value of the leather furniture she received from her sister exceeds the value of the two floral-print couches she gave in exchange, though neither the value of the leather couch nor that

of the floral print couches was established at trial.[32]

(44) Both Debtor and her sister[33] insisted that in the past they had routinely traded furniture but neither could give details as to when and/or how they had done so before 1991. In the past, Debtor and her sister had lived in different regions of the country; the Harnishes having lived in Michigan, Minnesota and Kansas City and the Cheeks having lived in Alaska.

(45) The trustee, upon first taking custody of the estate, found inexpensive rust and white colored plates displayed on the mantle in one room of Buckland Hall. These plates bore markings indicating they had been purchased at J.C. Penny's. Mrs. Cheek testified she had placed these plates on display on the mantle. In contrast, Christmas photographs taken in December of 1990, revealed the Debtor had displayed various pieces of pottery, pictures, two puppets imported from Thailand and what appear to be several decorative pill boxes on this mantle; these items were not among the property comprising the Debtor's estate.

(46) Debtor's signature appears on an IRA/Keogh Distribution Request Form and Tax Withholding Notice which seeks the distribution of $7,672.37 from Cowen & Company. A note from a Cowen & Co. representative, dated January 18, 1991, asks Mrs. Cheek to specify whether she wants "to borrow the money or make a normal distribution." Below the agent's note, an inscription preceding Debtor's initials says "[p]lease wire funds to our account." Debtor testified that she signed the Distribution Request form and initialed the accompanying inscription (which Malcolm wrote) at Malcolm's direction without

---

**31.** MAC testified, in his deposition, that he had called dealers around the country to get the best price for the car. He stated that his father had asked him how much the Mercedes was worth because he "was not much of a car buff and ... had no idea how much it would be worth to sell."

**32.** The only evidence concerning the value of the furniture exchanged consists of Mrs. Har-

nish's deposition where she testified that she did not recall where she bought the leather furniture she traded to her sister nor could she remember how much she paid for that furniture.

**33.** Heidi Harnish claimed she and her sister had traded couches four or five times in the last ten years.

understanding the significance of these acts.

(47) Debtor testified that the fixture originally installed in the ceiling of Buckland Hall's breakfast room was a brass lamp with Waterford Crystal globes, which was purchased from Cash's of Ireland for $300.00. Contrarily, the trustee testified that the original fixture in the breakfast room was a Waterford Crystal chandelier. Records introduced at trial show that Malcolm Cheek purchased four Waterford Crystal light fixtures from the Waterford/Wedgewood store at Frontenac Plaza for a total price of $22,766.54 and among the product numbers on the receipt documenting this purchase is one corresponding to a Waterford Crystal chandelier.

(48) Debtor purchased two light fixtures from Villa Lighting Supply (Villa Lighting) on February 15, 1991. Mrs. Cheek claimed she had purchased these fixtures for her daughter-in-law who planned to hang them in her and MAC's Creve Coeur condominium to replace two ceiling fans in the condo they wanted to bring to Atlanta. Mrs. Cheek testified that because the replacement fixtures were too large to fit into Debi's car she and Debi decided to store them in the basement of Buckland Hall. Mrs. Cheek further testified that as of March 1, 1991, the original fixtures were hanging in Buckland Hall's study and breakfast room and the ones purchased at Villa Lighting were in the basement.

(49) The trustee found the fixtures Debtor purchased at Villa Lighting on February 15, 1991, hanging in Buckland Hall, one in the breakfast room and the other in the study.

(50) The Cheeks maintained bank accounts at numerous banks. Debtor testi-

fied that her husband often moved money from one account to another and that he instructed her to use different accounts at different times and, in fact, told her when to pay each bill the couple received. She also testified that she never wrote a check for a large amount without procuring her husband's permission.

(51) The Plaintiffs produced and entered into evidence, copies of 41 checks drawn on the Cheeks's joint accounts, in an amount totalling $106,266.91. Malcolm and Stephanie drew these checks, all written to Stephanie Cheek's order, during the time period beginning in April of 1990 and ending in May of 1991.[34] Of the 41 checks, 20, written for a total of $38,600.00, were marked "for deposit only." The Debtor claimed that all the checks written on the couple's account at American Bank, 29 of the 41 checks, were for deposit only and that any of these she wrote were at Malcolm's direction. Debtor testified she did not question why she was writing these checks because she knew that Malcolm had to constantly move money from account to account.[35] Stephanie wrote six of these checks, totalling $17,266.91 after Malcolm Cheek disappeared.[36]

(52) Plaintiffs, at trial, presented Debtor with a $175,000.00 check, dated December 12, 1990, she drew to her own order on an account at Allegiant National Bank. Debtor testified that she had no recollection of this check which was returned to her, unpaid, because her account lacked the funds to pay it.

(53) The Plaintiffs also introduced into evidence a letter to Mercantile Bank signed by the Debtor. The letter, drafted on the letterhead of the law firm of Cheek & Garber P.C. states that Stephanie Cheek represents Brad Harnish and attempts to

---

**34.** Mrs. Cheek drew 36 of the 41 checks.

**35.** A review of the activity in the Cheeks's account at American Bank of Saint Louis shows that between October 25, 1990 and March 4, 1991 Malcolm and/or Stephanie Cheek wired over $1.6M into this account and wired more than $1.4M out of it. The trustee recognized that a tracing of these transactions showed that Malcolm Cheek had originated all but one of the numerous wire transfers.

**36.** Two of the checks, one for $9,000.00 and another for $5,000.00 were discussed above as the funds Debtor withdrew from her account at the direction of an anonymous New York attorney. Debtor also wrote a $21,000.00 check to herself on the day Malcolm disappeared, March 4, 1991. Debtor said she gave this $21,000.00 to her husband before he left for New York.

sort-out some problems Mr. Harnish had with Mercantile after a $251,000.00 check Malcolm Cheek wrote him bounced. In her deposition, Debtor admitted she wrote this letter. Yet at trial Mrs. Cheek insisted that she had not authored the letter, that Malcolm had written it and that she had merely typed it and signed her name to it.

(54) The record in this case includes checks written to various members of the Cheek family during the year preceding the creditors' petition against the Debtor. Among these checks drawn on the joint accounts of Malcolm and Stephanie Cheek are:

$197,500.00 worth of checks to Jonathon Cheek (Malcolm Cheek's brother and Debtor's brother-in-law); $130,000.00 worth of checks to Timothy Cheek (also Malcolm Cheek's brother and Debtor's brother-in-law); $116,000.00 worth of checks written to Brad Harnish; $341,000.00 worth of checks written to MAC; and $6,000.00 worth of checks written to Benjamin Cheek.[37]

Malcolm drew the vast majority of these checks.[38] In fact of these checks, Debtor only drew three; one to MAC for $32,400 on March 12, 1991 and two, totalling $1,000.00, during 1990 to Benjamin. Mrs. Cheek testified that the various checks Malcolm wrote to family members represented loans and other financial dealings he had with them. Debtor, however, could not provide any documentation or explanation of Malcolm's financial dealings with these relatives. The various family members involved in these transactions wrote the trustee letters, at Mrs. Cheek's request, explaining their dealings with Malcolm. The trustee testified that the information in these letters was insufficient to allow her to conclude what financial dealings Malcolm had with these family members. The trustee testified further that Brad Har-

nish's letter indicated that a $116,000.00 loan represented the extent of his financial dealings with his brother-in-law. After receiving Mr. Harnish's letter, the trustee discovered a $251,000.00 check from Malcolm to Brad.

(55) Debtor testified that on March 4, 1991, shortly before Malcolm disappeared, she and he went to the bank together in Atlanta. Bank records show that two $50,000.00 wire transfers out of the Cheek's account at American Bank of Saint Louis occurred on March 4, 1991. Mrs. Cheek explained that her husband wired these funds to their son's accounts and that MAC then withdrew the money and gave it to his father who needed the cash for his trip to New York.

(56) Bank records indicate a wire transfer in the amount of $13,000.00 was made from the Cheek's account at American Bank of Saint Louis to Stephanie Cheek's account at Bank South[39] in Georgia on March 5, 1991. Debtor testified that her husband had also originated this transaction on March 4, 1991 but because it occurred after 2:00 PM Eastern time, the bank recorded it as a March 5, 1991 transfer.

(57) The Plaintiffs also entered into evidence bank records showing the wire transfer, on March 7, 1991, of $2,500.00 from the Cheeks account at American Bank of Saint Louis to Stephanie Cheek's account at Bank South. Mrs. Cheek testified that she originated this transaction on the advice of the previously mentioned, anonymous New York attorney. Debtor testified that she wired $1,800.00 of these funds back to the American Bank account on March 11, 1991 when she realized there were outstanding checks drawn against that account.

---

**37.** Debtor testified that her husband wrote Benjamin Cheek a $5,000.00 check for his birthday but later borrowed the money back from his son.

**38.** In addition to these checks, the Plaintiffs entered into evidence 23 checks, totalling $247,058.00, Malcolm Cheek wrote to himself in the time period beginning December 10, 1990 and ending March 1, 1991.

**39.** Mrs. Cheek opened this account on February 26, 1991. She testified that she opened this account because she knew she would be in Georgia to assist her daughter-in-law with her pregnancy.

## DISCUSSION

The Debtor and Creditors [40] who filed adversary complaints asking this Court to deny Mrs. Cheek a discharge on the basis of various provisions of section 727 of the Bankruptcy Code agreed to consolidated these adversaries for a single trial. Each of the adversary complaints, as the Court has previously noted, made similar charges against Mrs. Cheek. To simplify the discussion, this opinion will refer to the different allegations as they are charged and denominated in Mercantile Bank's adversary complaint (hereinafter, the Complaint).

## FAILURE TO MAINTAIN RECORDS: SECTION 727(a)(3)

Count III of the Complaint asks the Court to deny Debtor her discharge under section 727(a)(3) of the Bankruptcy Code which provides:

(a) The court shall grant the debtor a discharge unless—

.     .     .     .     .

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

11 U.S.C. § 727(a)(3) (1988). Courts that have applied section 727(a)(3) have recognized that the section was enacted in an attempt to "insure that the trustee and creditors have sufficient information to trace the debtor's financial history for a reasonable period past to present." *In re Kassoff*, 146 B.R. 194, 200 (Bankr.N.D.Ohio 1992) (citing *Cox v. Lansdowne*, 904 F.2d 1399 (9th Cir.1990) and *Chicago Title In-*

*surance Co. v. Mart*, 87 B.R. 206 (Bankr. S.D.Fla.1988)).

The Creditors, at trial, stipulated that Mrs. Cheek had surrendered to them all the financial records in her possession but they argued that these documents did not sufficiently depict her financial situation because she had failed to maintain proper records.[41] In her defense, Mrs. Cheek offered the fact that she relied on her husband to keep records of their finances as an explanation for any deficiencies in the records she provided to the plaintiffs. Further, she maintained that because she had reasonably relied on her husband to maintain proper financial records, section 727(a)(3), by its terms, provided her a defense to the creditors' challenge to her discharge. The Court of Appeals for the Ninth Circuit, in a case factually similar to this one, held that a bankruptcy court committed error by failing to consider one spouse's reliance on the other spouse to maintain records in determining whether the debtor-spouse's failure to keep sufficient records was justified under all the circumstances of the case. *Cox v. Lansdowne (In re Cox)*, 904 F.2d 1399 (9th Cir.1990).

Deborah Cox, the debtor in the *Cox* case, was a former teacher and mother of two. *Id.* at 1400. Debtor's husband perpetrated a number of fraudulent schemes. By signing various documents at her husband's instruction, Mrs Cox became a partner in two fraudulent ventures, an officer and director in several of the vehicles her husband used to facilitate his fraudulent dealings, and the owner of several pieces of real property. *Id.* After briefly fleeing from creditors with her husband, Mrs. Cox surrendered to law enforcement authorities and participated in the involuntary bankruptcy that her creditors had filed against her. *Id.* The trustee filed an adversary complaint based on section 727(a)(3) of the

---

40. Throughout the remainder of this opinion, the Court will use the term Creditors to refer to the trustee and those of Mrs. Cheek's creditors who brought the adversary opinions now consolidated before the Court.

41. Count V of the Complaint alleges that "during the pendency of the ... case, Debtor has

withheld from the duly appointed Chapter 11 (sic) Trustee recorded information relating to her property and financial affairs, including but not limited to certain checks, check registers, bank statements and brokerage account statements." The plaintiffs agreed, at trial, to dismiss this portion of the Complaint.

Bankruptcy Code objecting to Mrs. Cox's discharge. *Id.* The Bankruptcy Court found that Mrs. Cox had failed to produce records which adequately described her financial condition and refused to consider her reliance upon her husband to keep those records because it viewed her as "an intelligent and educated" woman whose attempt to hide behind a "self-imposed curtain of ignorance" did not provide her with a legal defense under section 727(a)(3). *Id.* at 1400–01. The Bankruptcy Appellate Panel affirmed the Bankruptcy Court's decision. *Id.* at 1401.

The Ninth Circuit, affirmed the Bankruptcy Court's holdings that Mrs. Cox had not maintained sufficient records of her financial affairs and that she and her husband shared a duty to maintain such records. 904 F.2d at 1402. However, it reversed the Bankruptcy Court's decision because that court had not considered whether, under all the circumstances, Mrs. Cox had justifiably relied on her husband to keep records of their finances. *Id.* at 1403.

██ Mrs. Cheek, like Mrs. Cox, was and remains an intelligent and educated woman. She is licensed to practice law in the State of Missouri and holds a Missouri Real Estate Broker's license in addition to her licenses to sell real estate in Florida and Illinois. These facts convince the Court that Mrs. Cheek had and has the capacity to understand and participate in complicated financial transactions similar to those Malcolm Cheek directed. However, Mrs. Cheek's ability to understand complicated financial transaction is only one of a number of circumstances the Court must consider in deciding whether she acted reasonably in relying on her husband to keep records of their finances.

The Court recognizes that whether Mrs. Cheek reasonably relied upon her husband to maintain records of their finances depends a great deal upon both her husband's ability to maintain those records and the relationship she had with him. The evidence presented at the trial of these adversary proceedings showed that Malcolm Cheek worked seven days a week, often for as many as fifteen hours a day. Mrs.

Cheek testified that for years she had signed documents at Malcolm's direction and had unquestioningly written checks in accordance with his instructions. In fact, in a very candid admission, Mrs. Cheek testified that Malcolm had once become very upset with her when she wrote checks to pay bills without consulting him first and that he told her to never do that again because only he knew which bank accounts had funds in them at any time. The evidence demonstrated that throughout the Cheeks' seventeen-year marriage Mr. Cheek had exercised virtually total control of the family finances. In that time the Cheeks had enjoyed great prosperity and Malcolm had never given Stephanie any reason to doubt that he was maintaining proper financial records. Malcolm Cheek, a sophisticated businessman, was quite capable of maintaining proper records detailing his and Stephanie's financial condition and Mrs. Cheek had no reason to doubt that he was doing so. For both spouses to have maintained separate, duplicate records would have seemed a wasted effort. The Court, after considering all the circumstances, finds that Mrs. Cheek relied on Mr. Cheek to maintain proper records of their finances and that her reliance was reasonable. The Creditors have not met their burden under section 727(a)(3) and a judgement will be entered on Count III of the Complaint in favor of the Debtor.

FAILURE TO SUFFICIENTLY EXPLAIN LOSS OF ASSETS: SECTION 727(a)(5)

In Count VI of the Complaint, the Creditors ask the Court to deny Debtor her discharge on the basis of section 727(a)(5) of the Bankruptcy Code. That provision requires that a court deny the debtor a discharge when "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5) (1988).

██ The Creditors presented voluminous evidence at trial and established that many items of valuable personalty that the Cheeks once owned were not surrendered

to the trustee. Among the evidence the Creditors submitted were: receipts indicating that the Cheeks had purchased certain items, the testimony of different merchants who sold property to the Cheeks and the report of the auctioneer the trustee hired to liquidate the Cheeks' consolidated estate. By comparing the receipts showing what property the Cheeks had owned with both the auctioneer's sale list and the testimony of the vendors who, as described above, identified those items they had sold to the Cheeks from among the estate property the trustee held, one could deduce that certain items of property were missing from the estate.

Mrs. Cheek offered little explanation of what happened to the missing items of personalty. She testified that she did not attend the auction but could identify some of the items alleged to be missing by reviewing the video tape of the interior of her home, which depicted all the property the auctioneer sold. The Court acknowledges that the method by which the Creditors proved that property was missing from the Cheeks' estate was subject to error, for example, a vendor might not have recognized an item he sold to the Cheeks and if the trustee or auctioneer could not identify that item as one listed on a receipt from that vendor's store, then that item would erroneously be deemed to be missing. However, the vendors who viewed the Cheeks' estate and testified at the trial on this matter had many years of business experience selling the items they were trying to identify and the Court believes that the chances that a vendor did not properly identify an item he sold to the Cheeks are minimal.

Unfortunately but understandably, not all the vendors who sold personalty to the Cheeks could view the estate and testify at trial. The only pieces of evidence the Creditors offered to prove that the one of the items these non-testifying vendors sold to the Cheeks were missing were: the receipts showing that the Cheeks had bought the item, the testimony of the auctioneer and trustee to the effect that they did not recognize a given item among the property

of the estate and the absence of the item from the auction report describing the property of the estate that the auctioneer sold pursuant to this Court's order. The Court acknowledges that the auction report often used vague and generic descriptions to describe the items sold at the auction, for example, item number 122 on the auction report is "1 crystal vase." A receipt entered into evidence in this case shows that Stephanie Cheek purchased a Waterford-brand crystal vase for $1,371.66 from the Waterford/Wedgewood shop at Frontenac Plaza. Given only the testimony of the auctioneer, the trustee and the auction list, the Court cannot say without a doubt that item number 122 is not the Waterford crystal vase the receipt shows Mrs. Cheek purchased. However, of the items the Creditors allege are missing relatively few fit into item 122's category of property that was misdescribed in the auction report and possibly unrecognized by the trustee or auctioneer. In short, even giving Mrs. Cheek the benefit of the doubt that not every item the Creditors proved was missing was truly missing, the Creditors have established that substantial numbers of assets representing many thousands of dollars are missing from the Cheeks' estate.

Mrs. Cheek claims that any missing property, which is not explained by identification errors on the part of the vendors, trustee and auctioneer, was sold by her husband, Malcolm, when she was in Atlanta. The Court has considered the interrelationship of many facts and events in determining whether this satisfactorily explains the loss of assets that the Creditors proved occurred. The Creditors introduced a number of pictures into evidence which depicted people in attendance at a Christmas party the Cheeks hosted in December of 1990. In the background of these pictures one can see Buckland Hall as it was then furnished. These pictures show a mantle decorated with a puppet or doll, various pieces of pottery and what appear to be several decorative pill boxes, a wall with framed artwork and three shelves stocked with different ceramic pieces. None of these decorations were among Buckland Hall's furnishings when the trustee took posses-

sion of the estate. Shortly after this Christmas party, in the last week of January of 1991, the Debtor and her husband summarily dismissed their cleaning woman, Senka Meek. Ms. Meek testified, in her deposition which was introduced at trial, that in the nine months during which she worked at Buckland Hall, the home's furnishings did not change. Based on this evidence, the Court believes that all the property the Creditors demonstrated is missing from the Cheeks' estate was in Buckland Hall at the end of January 1991. It is interesting to note that Mrs. Cheek testified that the financial statement dated September 14, 1990, that listed "Other Personal Property: rugs, artwork" as valued at $250,000.00 was accurate. Considering the testimony of the Debtor and Senka Meek the Court finds that the personal property that was once at Buckland Hall had a worth of approximately $250,000.00.

Mrs. Cheek testified that her husband told her he would need to sell some of their possessions to raise funds for his business, Y & A Group. She stated that she was not surprised because over the years Malcolm often needed to raise funds to invest in his business. The Court finds this testimony to be both plausible and credible. Mrs. Cheek further testified that though Malcolm had told her, in general terms, that he needed to sell some of their personalty he never told her and she never asked such information as: who bought the different pieces of property he sold, how much money the buyers paid him, or where the different items went. The Court, after considering all the evidence, finds that Mrs. Cheek's testimony regarding the missing personal property is not credible. I do not believe her.

First, with the exceptions of the sale of furniture to MAC and the sale of the Mercedes to the Florida auto dealer, there is no factual evidence that Malcolm sold any personal property. The evidence simply reveals that a substantial amount of very valuable jewelry, furniture, rugs, artifacts and other personal property the Cheeks once owned is missing.

Second, Mrs. Cheek carefully chose and purchased the majority of the items which Malcolm allegedly sold. Because she selected the various pieces of personalty that Debtor insists her husband sold without telling her, the Court finds it incredible that the Debtor never once inquired of what became of a given item or asked how much money her husband received, for she certainly must have been curious. The Court finds it impossible to believe that someone who surrounded herself with very expensive furniture would not have asked her husband, at least once, what he got for her $12,893.19 Rolex watch, the ten-place setting of $6,800.00 sterling silverware, the $13,311.60 Kindell Rhode Island desk, the $2,783.00 Kindell Philadelphia Pie Crust table or any of the other individual pieces of furniture which, within the previous two years, cost them thousands of dollars. Debtor, however, insisted at trial that she knew absolutely nothing about the transactions in which her husband allegedly sold the bulk of their personalty.

The fact that Malcolm asked his son how much Mrs. Cheek's Mercedes was worth also discredits the Debtor's testimony that her husband did not discuss the sales of their personal property with her. Presumably, Mr. Cheek wanted to generate as much money as he could from the sales of personalty. Mrs. Cheek had been the primary purchaser of the items in Buckland Hall and, therefore, knew their value better than her husband did. Having consulted his son, who he thought possessed knowledge of cars, regarding the value of the car, the Court believes it is very likely that Mr. Cheek would have asked his wife how much some of the items in their home were worth before he sold them. Just as he looked to MAC to learn the value of the Mercedes, it follows he would inquire of his wife as to the value and best place to sell the personalty.

A third set of facts proved at trial suggests that Mrs. Cheek's explanation of the loss of her assets is unsatisfactory. Her son MAC testified that he owned one oriental rug. However, the inventory of personal property compiled by the movers who

moved the property belonging to MAC and his wife, Debi, from Saint Louis to Georgia indicates that the couple shipped seven large rugs. This fact, taken together with the fact that MAC rented a moving truck for February 2 and 3 of 1991, just one day after Stephanie ordered area rugs to put on the floors of Buckland Hall, suggests that the rugs MAC and Debi shipped to Georgia were the expensive oriental rugs that once covered the floors of Buckland Hall. These circumstances also indicate that Mrs. Cheek may not have purchased the area rugs from Advance Carpet and Sun Carpet to cover the bare floors of Buckland Hall so that the house would be decorated when prospective buyers walked-through it, but rather she bought the rugs to replace the home's oriental rugs hoping that no one would realize that the oriental rugs were missing.

A fourth circumstance undermines Debtor's explanation for the loss of her assets. Brad and Heidi Harnish, Debtors's brother-in-law and sister both testified, repeatedly and adamantly, that the Ehmke movers who shipped their belongings from Saint Louis to Georgia only shipped their belongings and not any of Stephanie's. The Harnishes also repeatedly and adamantly insisted that Brad had not rented a truck to move their belongings to Georgia. A receipt showing that Brad Harnish rented a twenty-four foot long truck with an inordinate number of pads leads the Court to believe that Mr. Harnish took much of the furniture the Creditor's proved was missing from Buckland Hall to Georgia. Other facts regarding the Harnishes' move to Georgia have led the Court to believe that personalty from Buckland Hall travelled with the Harnishes to Georgia. For instance, Stephanie purchased packing materials from Ehmke Movers in January 1991. Also, Mrs. Cheek wrote a check to Ehmke Movers to pay for the extra weight of items the movers picked-up at Buckland Hall. Debtor testified that she paid the extra weight because her sister was absent and the movers needed their money but she claimed that the only items loaded onto the Ehmke truck from Buckland Hall were property of her sister. Debtor claimed that she had purchased packing materials at Ehmke for her sister.

The four above-related events cannot be explained as mere coincidences and, when considered together, convince the Court that the Debtor simply has not satisfactorily explained the massive loss of assets that occurred between late January 1991 and the time her creditors filed an involuntary bankruptcy petition against her.

The Court also finds that the Debtor has failed to satisfactorily explain numerous wire transfers of money from her and her husband's different bank accounts. The Court will enter a judgement for the Creditors on Count VI of the Complaint.

FALSE OATHS: SECTION 727(a)(4)(A)

Section 727(a)(4)(A) of the Bankruptcy Code instructs a bankruptcy court to deny a debtor her discharge when she "knowingly and fraudulently, in connection with the case—(A) made a false oath or account." 11 U.S.C. § 727(a)(4)(A) (1988). The Creditors, in their joint trial brief, argue that Mrs. Cheek acted with reckless indifference when completing her statement of financial affairs and schedule of assets and liabilities and that this requires the Court to deny Debtor her discharge under section 727(a)(4)(A). The Court has, above, recounted the amendments Mrs. Cheek made to her schedules including: amending the stated value of her Bank South account's balance, adding her interests in two defunct entities (Cheek & Garber P.C. and CDWW, Inc.) and an insurance policy to her list of assets, and revaluing her interest in Y & A Group. The Court does not believe these initial errors on Debtor's schedules constitute reckless indifference. Mrs. Cheek explained that she misvalued her account because she erroneously believed that the date of reference for the value listed on the schedules was the date she completed the schedules, as opposed to the date on which her creditors filed the involuntary petition against her. The Court believes Mrs. Cheek's explanation for the misvaluation. The Debtor's initially scheduled interests in the business ventures and insurance policies may have been

an oversight and the Court does not believe the Creditors have demonstrated otherwise, especially in light of the fact that the Debtor amended her schedules to reflect her interests in these assets.

In their trial brief, the Creditors allege that Mrs. Cheek intentionally undervalued the property she claimed as exempt and that these undervaluations constitute false oaths within the purview of section 727(a)(4)(A). The Creditors did not carry their burden of proof at trial on these allegations and the Court will not deny the Debtor her discharge on the basis of these alleged undervaluations.

█ Another example of false oaths the Creditors' cite in their trial brief is the fact that the values of property listed on a financial statement the Debtor signed in September of 1990 appear to differ from the values Debtor assigned to the same assets in her schedules. The Court refuses to deny the Debtor her discharge on the basis of this allegation for two reasons. First, the financial statement to which the Creditors refer was not a sworn statement so any misvaluation on it cannot be a false oath. Second, assuming the values listed on the financial statement were accurate, the trustee and Mrs. Cheek's creditors failed to demonstrate that the values assigned to similar categories of assets in Mrs. Cheeks schedules were inaccurate. For example, the Cheeks might have owned, as the financial statement states, $250,000.00 worth of other personal property, including, rugs and artwork. Given Mrs. Cheek's testimony that her husband sold many assets in the beginning of 1991, one would not expect her to list $250,000.00 in personal property on her schedules. The fact that months before completing her schedules she and her husband possessed personalty valued at $250,000.00 and the fact that the Debtor did not list $250,000.00 in personal property on her schedules do not, without more, prove that Mrs. Cheek swore a false oath when she completed her schedules. To prove that Debtor swore a

false oath in completing her schedules, the Creditors would have had to have shown that the property which the Debtor, on her schedules, claimed had one value, in fact, had a different value and that the Debtor knew of the difference when she completed her schedules.

At trial, the trustee alleged that the Debtor's changing story regarding some furniture her husband sold to her son qualified as a false oath which required this Court to deny Debtor her discharge. The Debtor, in her 2004 examination, stated that Malcolm sold MAC enough furniture to fill the living room of MAC and Debi's new home in Georgia. Debtor later learned that MAC had bought the furniture from his father so that he could furnish his office in Georgia and produced for trial a receipt which MAC had saved so that he could seek reimbursement for the cost of the furniture from his employer. Mrs. Cheek testified at trial that she had been mistaken when she stated at her 2004 exam that MAC had bought the furniture for his new home. The Debtor clearly erred when she stated that her son purchased the furniture for his home. While this statement was inaccurate, and a misstatement of fact, it was not a false oath because there is no evidence that the Debtor knew that the statement was untrue when she uttered it.

The Court will enter a judgement for the Debtor on Count IV of the Complaint.

REMOVAL AND CONCEALMENT OF ASSETS OF THE DEBTOR WITHIN ONE YEAR OF FILING AND REMOVAL AND CONCEALMENT OF ASSETS OF THE ESTATE AFTER FILING: SECTIONS 727(a)(2)(A) AND (B)

█ The Creditors proved that Mrs. Cheek did not surrender her tax return checks to the trustee, instead, she deposited these checks, representing $16,009.00, in her checking account at Bank South and withdrew their proceeds to pay her and her minor son's living expenses. Likewise, Debtor deposited a $460.00 check[42] from the Riverside Military Academy into her

---

**42.** This check represented the unused portion of Benjamin Cheek's pre-paid tuition. The school returned this to Mrs. Cheek following Benja-min's withdrawal from the Riverside Military Academy.

Bank South account and used it to support herself and her son Benjamin. Further, Debtor continued, post-petition, to access other funds that were in the Bank South account on the date her creditors filed the involuntary petition of bankruptcy against her and used them for her and her son's support. All these funds that were property of the estate should have been surrendered to the trustee. Mrs. Cheek's post-petition use of these estate assets violated section 727(a)(2)(B) of the Bankruptcy Code which instructs a court to deny a debtor the discharge of her debts when she:

> with the intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under this title [U.S.C. Title 11], has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
> .    .    .    .    .
>
> (B) property of the estate, after the filing date of the petition.

11 U.S.C. § 727(a)(2)(B) (West 1993). The Debtor's post-petition uses of the tax refunds, returned tuition and funds stored in the Bank South account clearly constitute transfers of estate assets. The Court believes the Debtor possessed the intent to hinder or delay her creditors because she spent these funds instead of surrendering them to the trustee. The effect of so using the estate's property is to hinder or delay creditors because the funds, once spent for Debtor's living expenses are no longer available to pay the claims of her creditors. The Court will enter judgement for the Creditors on Count II of the Complaint and deny Debtor her discharge on the basis of 11 U.S.C. § 727(a)(2)(B).

■ Count I of the Complaint asks the Court to deny the Debtor a discharge of her debts because she violated section 727(a)(2)(A) of the Bankruptcy Code. That section requires a court to deny a debtor her discharge when:

(2) the debtor, with the intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under this title [U.S.C. Title 11], has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

.    .    .    .    .

> (A) property of the debtor, within one year before the date of the filing of the petition;

11 U.S.C. § 727(a)(2)(A) (1988) The Court in our discussion of Count VI of the Complaint has recounted many facts and circumstances which suggest that the Debtor and her family removed large amounts of personalty from Buckland Hall in January, February and March of 1991. The sale of the Debtor's Mercedes, the disappearance of Buckland Hall's oriental rugs, expensive furniture and other personalty belonging to the Debtor and her husband, the numerous unexplained wire transactions, as well as Debtor's gifts of furniture to her sister and daughter-in-law all indicate that the Debtor and her husband acted to delay, hinder and defraud their creditors in the year before the Debtor filed her bankruptcy petition.[43] Had the Debtor demonstrated that the proceeds from the alleged sales of this property were invested in Y & A Group, the Court might have been inclined to rule in her favor on Count I of the Complaint. Absent such a showing, the Court can only conclude that many of the items the Creditors proved are missing were not necessarily sold but were intentionally removed from the reach of Debtors' creditors.

■ The Creditors alleged that the Debtor's withdrawal of funds from her Bank South account on the advice of an anonymous New York attorney also violated section 727(a)(2)(A). The Court disagrees that this in and of itself warrants denying the Debtor her discharge. Rather, the Court agrees with the Ninth Circuit Court of Appeals which has held that when a debtor acts in good faith upon the advice of coun-

---

**43.** The Debtor's creditors filed an involuntary bankruptcy petition against her. The Court does not believe that this fact alone precludes a finding that the Debtor could not have intended to hinder, delay or defraud her creditors in the year before filing.

sel, a transfer of property does not violate section 727(a)(2)(A) because in such circumstances the debtor lacks the intent that section requires. *In re Adeeb*, 787 F.2d 1339 (9th Cir.1986).

The Court will enter a judgement in favor of the trustee and Mrs. Cheek's creditors on Count I of the Complaint.

The Court recognizes that it previously entered an order substantively consolidating the bankruptcy cases of B. Malcolm Cheek and Stephanie A. Cheek. In denying Stephanie A. Cheek her discharge, the Court only intends to *deny discharge of* her debts, not those debts which became hers solely as a result of this Court's order substantively consolidating her bankruptcy case with her husband's. In other words, the Court does not deny Stephanie A. Cheek the discharge of those debts which, before the consolidation of these cases, were owed solely by B. Malcolm Cheek.

An Order consistent with this Memorandum Opinion will be entered this date.

## ORDER

For the reasons set forth in the Memorandum Opinion filed this date, IT IS ORDERED that

(1) Plaintiffs' request that the Court deny Debtor her discharge for alleged violations of Sections 727(a)(3) and (a)(4)(A) of Title 11 of the United States Code IS DENIED; and

(2) Plaintiffs' request that the Court deny Debtor her discharge pursuant to Sections 727(a)(2)(A), (a)(2)(B), and (a)(5) of Title 11 of the United States Code is GRANTED. DEBTOR'S DISCHARGE IS DENIED.