In re Bruce A. SAWYER.

**PRUDENTIAL–BACHE SECURITIES, INC., Plaintiff/Appellee,**

v.

**Bruce A. SAWYER, Defendant/Appellant.**

Civ. A. No. 88–K–308.
Bankruptcy No. 86 B 11451 E.
Adv. No. 87 E 202.

United States District Court,
D. Colorado.

March 22, 1990.

James W. Bain, Jeffrey B. Klaus, Brega & Winters, Denver, Colo., for Sawyer.

Diane Davies, Edward B. Towey, Loser, Davies, Magoon & Fitzgerald, Denver, Colo., for Prudential–Bache.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

This is an appeal from the bankruptcy court's decision denying the debtor, Bruce A. Sawyer, the discharge of a debt to his employer, Prudential–Bache Securities, Inc. Sawyer contends that the court erred in denying the discharge of this debt under § 523(a)(2)(A) of the Bankruptcy Code because (1) he obtained no money, property or services when he purchased commodities futures contracts for a customer without authorization, (2) he had no actual intent to deceive his creditors by making these purchases, and (3) the bankruptcy court should have required Prudential–Bache to prove its damages by clear and convincing evidence, instead of by a preponderance of the evidence. Although I agree that Sawyer's debt to Prudential–Bache is non-dischargeable, I reach this conclusion on a different

statutory basis than did the bankruptcy court.

## I. *Facts.*

The facts of this case are undisputed. Sawyer was employed by Prudential–Bache as an account executive in its Greeley office. One of Sawyer's accounts was Webster Feedlots, Inc. On February 12 and 13, 1985, Sawyer placed orders for 110 cattle futures contracts for Webster's commodity account.[1] Only 26 of these contracts were authorized by Webster; the remaining 84 were unauthorized. Sawyer made the unauthorized purchases hoping that two potential customers, Messrs. Erlich and Farr, would place accounts with him and the futures contracts could be transferred to these accounts. The garnering of these customers never materialized, and the market for the cattle futures took a turn for the worse. Even though the market was moving against the unauthorized positions, Sawyer did not liquidate them.

The purchases of these contracts were made on margin. As this process is described by Prudential–Bache, Sawyer used a small amount of cash from the Webster commodities account to make the purchases, and Prudential–Bache financed the rest of the purchase price using the remainder of the assets in the Webster account as security, or "margin." When the value of the contracts decreased, the assets of the account were depleted, and Prudential–Bache issued a "margin call," representing its actual cash loss on the contracts. On February 14, 1985, Prudential–Bache issued a margin call to Webster on the contracts purchased by Sawyer. Additional margin calls were to have been sent out on a daily basis thereafter, and confirmation of the trades should also have been forwarded to the company. Company officials testified, however, that such notices were never received.

Bruce Hemmings, branch manager for Prudential–Bache, and Susan Montoya, operations manager, repeatedly advised Sawyer of the margin call and requested that Sawyer clear the margin account. Sawyer reassured them that the account was alright. When the shortfall reached $100,-000, Ms. Montoya demanded that Sawyer clear the account. Sawyer then told Montoya to transfer the sum from another Webster account, the pension and profit sharing account. Ms. Montoya responded that she could not do so without a letter of authorization from Webster. Sawyer took the letter that Ms. Montoya had drafted, saying that he would have it signed. Ms. Montoya then made the $100,000 transfer between the accounts.

Sawyer never obtained Webster's consent to the transfer. When presented with the letter of authorization, Webster officials refused to sign it and instead modified the letter to require that funds be re-transferred back into the pension and profit sharing account. Since the funds in the commodities account were depleted, the re-transfer was impossible, and Prudential–Bache was forced to compensate Webster for its loss arising out of the unauthorized trades, approximately $165,835.60. In exchange, Webster assigned to Prudential–Bache its rights against Sawyer.

On February 26, 1985, Sawyer admitted to Prudential–Bache that he had made unauthorized trades totalling $119,500.00 and executed a promissory note to Prudential–Bache for this amount. Sawyer then defaulted on the note, and Prudential–Bache brought a state court action to enforce its terms and to recover other amounts attributed to Sawyer's unauthorized trades. Prudential–Bache obtained judgments totalling $179,280.28 against Sawyer, and Sawyer declared bankruptcy. Prudential–Bache responded by objecting to the dischargeability of Sawyer's debt to it under 11 U.S.C. § 523(a)(2)(A), (4), and (6).

The bankruptcy court held a hearing on Prudential–Bache's objection to discharge on December 10, 1986. At the close of the hearing, the court entered its findings of

---

**1.** A commodity future is generally defined as a "standardized contract for purchase and sale of a fixed quantity of a commodity of designated grade, for delivery in a specified future month, at a price agreed on when the contract is made." *See Mallen v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 605 F.Supp. 1105, 1107 (N.D.Ga. 1985).

388

fact and conclusions of law. First, it noted that, under § 523, the creditor has the burden to prove by clear and convincing evidence that the discharge should be denied. R.Vol. II at 167. As for Prudential–Bache's assertion that Sawyer violated § 523(a)(6), the court noted that under Tenth Circuit law, there must be an actual intent to cause injury. It then found that "there is nothing in this record that would lead me to believe that there was such an intent to cause a willful and malicious injury." *Id.* at 173–74. With respect to the claim under § 523(a)(4), the court stated:

> The 523(a)(4) claim pertains to a debt which has been incurred by fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny. It's clear there was no embezzlement or larceny here. The plaintiff has argued that there was this fiduciary capacity. It is true that there is a recognized fiduciary obligation that runs from a stockbroker to his customer. It's recognized in the federal law, its recognized very clear in the State of Colorado. It pertains to his obligation to execute the trades fairly and expeditiously, and to not do things like execute unauthorized trades in the account.
>
> But again, the Tenth Circuit has expressed itself, saying the fiduciary relationship must arise out of an express trust, not out of an agency relationship. And to the extent that the Tenth Circuit has looked at relationships that arise between the parties in things such as real estate cases, and this Court has recognized them in the case of a—an agricultural warehouseman under the Colorado statutes, which impose explicit and express trust obligations by the statute; those are the exceptions that the Tenth Circuit has carved out. And I do not think that the fiduciary relationship that existed here was one that falls within the meaning of 523(a)(4).

*Id.* at 174.[2]

Finally, the bankruptcy court concluded that the "real nub of the case" arose under

§ 523(a)(2)(A). It found that when Sawyer placed the unauthorized trades, he became obligated for any losses that might accrue as a result of them. "That act by the debtor to engage in that transaction and abuse the trust agreement—the fiduciary relationship that he had with Webster, was fraud, and there's no question of that. So there was a debt that was created by the debtor's fraudulent conduct." *Id.* at 176. Although it found that there had been a violation of § 523(a)(2)(A), the court denied recovery to Prudential–Bache because it failed to establish its damages with certainty. Prudential–Bache then moved for reconsideration, and after reviewing the record on damages, the court awarded the company $77,416. Sawyer now appeals.

## II. *Issues.*

### A. *Denial of Discharge under § 523(a)(2) for Property, Services, etc. Obtained by False Pretenses, False Representation or Fraud.*

■ Sawyer's first argument in this appeal is that § 523(a)(2) does not apply by its terms. This section of the Code provides that a discharge under § 727 of the Code does not discharge an individual debtor from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). Sawyer's argument is that, by making the unauthorized purchases, he did not obtain any "money, property, services, or an extension, renewal or refinance of credit."

Prudential–Bache disagrees. It points to the bankruptcy court's holding that Sawyer obtained and became obligated for the cattle futures contracts when he purchased them without authorization. Although in its brief, Prudential–Bache describes in detail the nature of commodities futures contracts, it cites no authority to the effect that when a broker obtains unauthorized contracts, he holds them for his own benefit and not for the benefit of the client. This is not a correct statement of the law.

---

**2.** The bankruptcy court also expressed its concern that the fiduciary relationship was between Sawyer and Webster, and not Sawyer and Prudential–Bache. *Id.* at 175.

A broker is defined as "one who is engaged for others, on a commission, in negotiating contracts relative to property with the custody of which [sic] he has no concern." 12 C.J.S. *Brokers* § 2 (1980).

As a broker, a person is not entitled to the possession of the property which is the subject of sale or purchase. He has nothing to do with the title or ownership of the property, and generally does not act in his own name, or on his own account, but in the name of the principal who employs him.

*Id.* § 5; *see also id.* § 67. Prudential–Bache cites no authority, and I have found none, that holds that when a broker makes an unauthorized purchase of a contract, he holds title to that contract and receives its benefits.

The more logical rule is that when the broker performs unauthorized acts, the principal may recover damages for any loss that ensues, but title to the authorized contracts would remain with the principal. *See id.* § 55. If, in fact, title to the wrongfully purchased contracts were to revert to the broker, there would be no need for the creation of a private right of action on behalf of customers of brokers for the recovery of losses due to unauthorized or improper transactions. *See generally, Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). Moreover, Prudential–Bache's branch manager testified at trial that if the value of the unauthorized contracts would have risen instead of fallen, Sawyer would *not* have had access to the funds generated by the account. Thus, Prudential–Bache's argument that Sawyer is deemed to have a proprietary interest in the unauthorized contracts only when *their value decreases, but not when it increases*, is inconsistent and illogical.

Additionally, the parties have cited no case in which § 523(a)(2) has been applied to a situation involving a stock or commodities broker making unauthorized purchases. The only similar cases have arisen under § 523(a)(4), dealing with the dischargeability of a debt for fraud or defalcation while acting in a fiduciary capacity.

Therefore, I conclude that Prudential–Bache did not establish by clear and convincing evidence that Sawyer received money, property, services or credit through false pretenses, false representation or fraud. Consequently, I do not address Sawyer's second argument that he had no intent to deceive his creditors.

B. *Denial of Discharge of Debt Under § 523(a)(4) for Defalcation While Acting in a Fiduciary Capacity.*

■ Section 523(a)(4) of the Bankruptcy Code provides that the debtor is not discharged for a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). The specific requirements of § 523(a)(4) are succinctly described in *Joseph v. Stone (In re Stone)*, 91 B.R. 589 (D. Utah 1988).

The question of who is in a fiduciary status for purposes of § 523(a)(4) is one of federal law.

Courts have recognized that the federal definition of "fiduciary" is quite different from the traditional common law definition. In fact, it has been specifically noted that the general meaning of a fiduciary is too broad for the purposes of § 523(a)(4).

Consequently, the term "fiduciary capacity," as defined by federal law and for purposes of § 523(a)(4), applies only to technical trusts, express trusts, or statutorily imposed trusts and not to fiduciary relationships which arise from an equitable trusts [sic], implied trusts, constructive trusts, or an agency relationship.

Moreover, the "fiduciary relationship" of § 523(a)(4) has been specifically held to not encompass ordinary commercial relationships such as those of principal/agent or debtor/creditor. Finally, courts also require the trust or fiduciary duty to be in existence before the occurrence of the act from which the debt arose. In other words, the debtor must have been a trustee or fiduciary before the wrong and not a trustee *ex maleficio*.

*Id.* at 593–94 (citations and footnotes omitted).

The bankruptcy court rejected § 523(a)(4) as a basis for the denial of a discharge in this case because it concluded that under Tenth Circuit law, Sawyer was not acting in a fiduciary capacity. Although I understand the bankruptcy court's reluctance to apply § 523(a)(4) in this situation, as discussed below, Tenth Circuit law may not be so limited. In addition, there is a nearly identical case in which a commodity broker was denied a discharge under this section.

The primary reason that the bankruptcy court was reluctant to rely on § 523(a)(4) is the Tenth Circuit's opinion in *Hill v. Bache Halsey Stuart Shields, Inc.*, 790 F.2d 817 (10th Cir.1986). In *Hill,* the court of appeals reversed the district court on a number of issues arising out of a case involving a commodities broker charged with churning and making unauthorized trades. With respect to the trial court's jury instructions on § 4b of the Commodity Exchange Act, 7 U.S.C. § 6b, the appellate court concluded that the trial court erred in referring to the broker's fiduciary duty under this section.

Section 4b makes no mention of fiduciary duties. Some agency and court decisions have read fiduciary duty rules into § 4b in an attempt to fully implement the anti-fraud provisions of that section. But this fundamentally misconstrues the purpose of fiduciary duty rules and directly contravenes the express language of § 4b.

The purpose of fiduciary duty rules is to eliminate the need for a fraud inquiry.... To say § 4b requires a fiduciary duty analysis is to say that § 4b is *not* a fraud provision and that it creates per se liability rules that do not look to intent or damages. In Part I we reaffirmed our conclusion that § 4b is a fraud provision, expressly requiring willfulness for its violation.... The instruction on fiduciary duty under the CEA was inappropriate and only confused that issue.

*Id.* at 823. Based on *Hill,* the bankruptcy court in this case concluded that Sawyer was under no fiduciary duty.

In contrast, in *Smith v. M & M Commodities, Inc. (In re Smith),* 72 B.R. 61 (N.D.Iowa 1987), the court reached the opposite conclusion. In *Smith,* the debtor, Gary Lee Smith, was employed as a broker for M & M Commodities, Inc. Industry and M & M rules prohibited brokers from making "discretionary trades," or trades made without the specific authorization of the customer. Nevertheless, Smith made five discretionary trades. Smith's customers refused to pay their accounts with M & M's clearinghouse, and M & M had guaranteed their payment. Consequently, M & M was forced to cover the cost of Smith's unauthorized trading. To repay M & M for its loss, Smith executed a promissory note to M & M. Smith then filed for bankruptcy with $11,335.61 owing on the note. *Id.* at 62.

M & M moved under § 523(a)(4) to have the debt to it declared non-dischargeable. The bankruptcy court ruled in M & M's favor, and Smith appealed. The district court affirmed the bankruptcy court's ruling. First, it held that Smith was acting in a fiduciary capacity. It noted that for the purposes of § 523(a)(4), the fiduciary capacity must arise from an express or technical trust. *Id.* It went on to find that such a trust was created by the Commodity Exchange Act, 7 U.S.C. §§ 1–26, and the regulations promulgated thereunder because these laws placed specific limits on the actions of brokers with respect to customer funds. *Id.* at 63. Finally, it concluded that Smith's acts constituted a "defalcation," in that this term included even slight misconduct. *Id. In re Smith* has not been cited by any other court, and the parties have not addressed this case in their briefs, most likely because they accepted the bankruptcy court's holding that § 523(a)(4) did not apply.

Under the rationale of *In re Smith* and other cases in this circuit, the Tenth Circuit's holding in *Hill* does not preclude a finding that the Commodity Exchange Act creates a technical trust in favor of the commodities purchaser. The provisions relied on by the *In re Smith* court to find such a trust relate to the segregation and

commingling of funds under § 6d(2) of the Act and the regulations which prohibit brokers from trading without the specific consent of the customer, *see* 17 C.F.R. § 166.2 (1989), and not the prohibitions under § 4b of the Act construed by the court in *Hill.* More importantly, Tenth Circuit precedent recognizes that a statutory scheme can give rise to an express trust and a fiduciary relationship within the meaning of the dischargeability statute.

In *Allen v. Romero (In re Romero)*, 535 F.2d 618 (10th Cir.1976), a case decided under the analogous section of the Bankruptcy Act, the court held that New Mexico's comprehensive scheme of licensing those engaged in the construction industry imposed a fiduciary duty on the debtor contractor who had been advanced money under a construction contract:

> That Romero [the debtor] was acting in a fiduciary capacity imposed by law rather than one implied by law, is evidenced by the fact that his obligation not to divert advances is imposed by statute. The fiduciary capacity in which Romero was acting accordingly existed independent of any express understanding he had with Allen governing the same obligation. Obtaining a state license by a contractor is a prerequisite to entering the construction industry in New Mexico; accordingly, the obligations imposed under [New Mexico law] were binding upon Romero prior to any dealings he had with Allen. We hold that the Bankruptcy Court's findings that Romero was acting in a fiduciary capacity within the meaning of § 17(a)(4), *supra,* is not clearly erroneous.

*Id.* at 622.

Although *Romero* has been criticized by several courts, it has been reapplied by a number of others in diverse situations. For example, in *Anderson v. Currin (In re Currin)*, 55 B.R. 928, 932–33 (Bankr.D. Colo.1985), the court followed the *Romero* analysis to conclude that Colorado's real estate broker's licensing statute imposed a fiduciary duty on the debtor so as to preclude a discharge under § 523(a)(4). Likewise, in *Griffiths v. Peterson (In re Peterson)*, 96 B.R. 314, 321–22 (Bankr.D.Colo. 1988), the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b–1 to –21, and the regulations thereunder were held to establish the requisite trust relationship. *Cf. Orem Postal Credit Union v. Twitchell (In re Twitchell)*, 72 B.R. 431 (Bankr.D.Utah 1987) (holding credit union president liable under § 523(a)(4) for breach of fiduciary duty created by state laws regulating financial institutions), *rev'd*, 91 B.R. 961 (D.Utah 1988), *decision reinstated by*, 892 F.2d 86 (10th Cir.1989); *Armstrong Rubber Co. v. Anzman (In re Anzman)*, 73 B.R. 156, 166 (Bankr.D.Colo.1986) (statute must contain "sufficient words to create a trust, a definite subject, a certain object or *res,* with intent to create the trust relationship"). *But see Coleman v. Choisnard (In re Choisnard)*, 98 B.R. 37 (Bankr.N.D. Okla.1989) (statutorily imposed trust does not arise under Securities Exchange Act because broker's actions related to preparation of offering, not purchase of securities).

Here, the Commodities Exchange Act imposes similar requirements on commodities brokers as do the statutes in *Romero, Currin,* and *Peterson.* Although under *Hill,* the provisions of § 6b of the statute may not, in and of themselves, impose a fiduciary duty on the broker, other provisions can be construed as doing so. I concluded that § 523(a)(4) applies in this situation, and that the stipulated facts indicate that Sawyer committed a defalcation while acting in a fiduciary capacity.[3]

The bankruptcy court's decision denying the dischargeability of Sawyer's debt to Prudential–Bache is AFFIRMED for the reasons stated above.

---

3. Likewise, as to Sawyer's final argument that the court erred with regard to the standard of proof as to Prudential–Bache's damages, the record demonstrates that there was clear and convincing evidence of Prudential–Bache's damages to the extent awarded by the bankruptcy court. Any confusion relating to the standard actually applied by the bankruptcy court was harmless error.