In re Jeffrey A. SIDDELL, Debtor.

**ONBANK & TRUST COMPANY,**
**Plaintiff,**

v.

**Jeffrey A. SIDDELL, Defendant.**

In re William E. MARKLEY, Debtor.

**ONBANK & TRUST COMPANY,**
**Plaintiff,**

v.

**William E. MARKLEY, Defendant.**

Bankruptcy Nos. 94–60208, 94–60210.
Adv. Nos. 94–70089, 94–70090.

United States Bankruptcy Court,
N.D. New York.

Jan. 12, 1996.

Melvin & Melvin (Louis Levine, of counsel), Syracuse, New York, for OnBank & Trust Co.

Martin, Martin & Woodard, L.L.P. (Lee Woodard, of counsel), Syracuse, New York, for William Markley.

Goldberg & Fabiano, L.L.P. (Harold Goldberg, of counsel), Syracuse, New York, for Jeffrey Siddell.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

The Court considers herein two adversary proceedings, each commenced on June 23,

1994, by OnBank & Trust Co. f/k/a The Merchants National Bank & Trust Company of Syracuse, New York ("OnBank"). On-Bank filed complaints against William E. Markley ("Markley") and Jeffrey A. Siddell ("Siddell") (collectively, "Debtors") objecting to the dischargeability of a debt pursuant to §§ 523(a)(4) and (a)(6) of the Bankruptcy Code (11 U.S.C. §§ 101–1330) ("Code").

Issue was joined on July 8, 1994, by service of an answer on behalf of Siddell and by service of answer on behalf of Markley on July 14, 1994. Amended answers were filed on behalf of Siddell and Markley on July 15, 1994, and July 21, 1994, respectively.

In an effort to avoid unnecessary costs and delay, the parties entered into a Stipulated Order dated May 11, 1995. The Stipulated Order provided for a joint trial of the two adversary proceedings as they appeared to concern the same facts and transactions. Pursuant to the Stipulated Order, the Court heard testimony on July 6, 1995, and thereafter concluded the trial on August 8, 1995. The parties were then afforded an opportunity to file memoranda of law and the matter was submitted for decision on September 25, 1995.

### JURISDICTIONAL STATEMENT

The Court has core jurisdiction of these adversary proceedings pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1), (b)(2)(I) and (J).

### FACTS

Sargent, Webster, Crenshaw, & Folley ("Sargent, Webster" or "partnership") was a partnership which provided engineering and architectural design services with its principal place of business in Syracuse, New York.[1] As of June 1, 1993, Markley and Siddell were two of the four general partners of Sargent, Webster. See OnBank's First Request for Admissions at ¶ 1 and 2.

OnBank alleges that Sargent, Webster was indebted to it pursuant to its guaranty dated January 12, 1989, of a Note executed by Richard and Lynn–Dell Dore in the original

principal amount of $50,000. See OnBank Exhibits "1" and "8". On or about June 11, 1991, Markley and Siddell both executed personal guaranties of Sargent, Webster's indebtedness to OnBank. See OnBank Exhibit "2" and "3". Thereafter, on or about December 23, 1992, Sargent, Webster executed and delivered to OnBank a Note in the original principal amount of $500,000. See OnBank's First Request for Admissions at ¶ 12; OnBank Exhibit "7".

To secure repayment of the above obligations, OnBank held a mortgage on Sargent, Webster's office building located at 2112 Erie Blvd. East, Syracuse, New York ("office building"). OnBank also held a perfected security interest in substantially all of the partnership's personal property, including all equipment, contracts, account receivables, general intangibles and proceeds thereof. See OnBank's First Request for Admissions at ¶ 16; OnBank's Exhibits "5" and "6" (Uniform Commercial Code filing forms).

Siddell testified on direct examination by his counsel, Harold F. Goldberg, Esq. ("Goldberg"), that the partnership became delinquent on its obligations to OnBank in the Spring of 1992. On or about June 18, 1993, Sargent, Webster discontinued its business. See OnBank's First Request for Admissions at ¶ 17. Siddell further testified that Sargent, Webster was unable to meet its last bi-weekly payroll obligation for the period immediately preceding June 18, 1993. Siddell stated that Sargent, Webster's last payroll obligation for its 45 employees was approximately $46,000.

On or about June 1993 Edward C. Pierie ("Pierie"), an OnBank loan administrator, was assigned by OnBank to collect the outstanding balance on Sargent, Webster's account. On cross-examination by Goldberg, Pierie stated that after examining Sargent, Webster's loan portfolio in June 1993, he believed that the partnership had outstanding account receivables of approximately $700,000. Pierie also admitted that at the time of his initial examination of the partner-

---

1. On December 28, 1993, Sargent, Webster filed for relief under Chapter 7 of the Code. See *infra* text at 550. Sargent, Webster's Chapter 7 case remains open as there are pending adversary proceedings.

ship loan portfolio, he became aware of an October 28, 1992, appraisal of Sargent, Webster's office building. The 1992 appraisal, which was commissioned by OnBank, valued the office building at $790,000. *See* Debtors' Exhibit "A".

The record reflects that beginning in June 1993 the partners undertook various measures in response to Sargent, Webster's financial position. First, on or about June 22, 1993, all four of Sargent, Webster's general partners met with OnBank representatives. The OnBank representatives included Pierie and Louis Levine, Esq. ("Levine"), OnBank's present counsel. Siddell testified that at the June 22 meeting, OnBank representatives requested that the partnership establish a Lockbox account at OnBank. Thereafter, Sargent, Webster entered into a Lockbox agreement with OnBank dated June 22, 1993. *See* OnBank's Exhibit "10". The Lockbox agreement provided, among other things, that Sargent, Webster's clients were to forward all receivable payments to the Lockbox account and such payments were to be applied to reduce the partnership's indebtedness to OnBank. *Id.* at ¶ 1.

Siddell testified that the partners again met with OnBank representatives on or about July 7, 1993. Siddell stated that the partners informed OnBank that Sargent, Webster had instructed its clients to forward payments to the Lockbox account. *See* Debtors' Exhibits "H", "I", "J", and "K" (Sargent, Webster letters to clients). Siddell admitted, however, that some clients continued to make payments to Sargent, Webster despite the instruction to remit payments to the Lockbox account.

Siddell also testified that at the July 7 meeting the partners requested OnBank to release a portion of the Lockbox proceeds such that Sargent, Webster could meet its last payroll obligation. On cross-examination by Levine, Siddell admitted that the partners rejected OnBank's offer to release proceeds in the Lockbox account if the partners, among other things, executed confessions of judgment.

On or about July 1993 Sargent, Webster and OnBank were also negotiating the sale of certain Sargent, Webster assets to Maniktala Associates, P.C. ("Maniktala"). *See* OnBank's Exhibit "11" (OnBank letter to Maniktala dated July 6, 1993, and approved by Sargent, Webster partners). On direct examination by Levine, Lawrence Young ("Young"), Maniktala's chief accountant, testified that Maniktala and Sargent, Webster entered into an agreement dated July 12, 1993 ("Maniktala agreement"). *See* OnBank Exhibit "37" (Maniktala agreement). Young admitted on cross-examination by Goldberg that he had reviewed Sargent, Webster's financial records prior to the Maniktala agreement. Young testified that he found Sargent, Webster's analysis of its account receivables for work in progress as "slightly optimistic but I didn't think it was out of the ballpark." [2]

Young explained that pursuant to the Maniktala agreement all proceeds of accounts receivable for Sargent, Webster work invoiced through July 6, 1993, were to be forwarded to the Lockbox. *See* OnBank's Exhibit "37". The Maniktala agreement also provided that Sargent, Webster assigned any work in progress as of July 6, 1993, to Maniktala and payment for all professional services thereafter rendered were to be forwarded to Maniktala. Young testified that OnBank retained its interest in proceeds or receivables in excess of direct labor costs and overhead earned by Maniktala on account, of the assigned work. Thereafter, on July 21, 1993, OnBank issued a letter dated July 6, 1993 ("July 6 letter") to both Maniktala and Sargent, Webster. *See* OnBank Exhibit "11". The July 6 letter confirmed the discussions and agreements between the parties. *Id.* The July 6 letter also provided,

> "Notwithstanding anything herein to the contrary, nothing herein nor in the Letter [Lockbox agreement] or otherwise shall be deemed to create a partnership, joint venture, or any other relationship of agency or concerted action of the Bank [OnBank] with either Sargent and/or Maniktala." *Id.* at ¶ f.

2. The parties did not specify the amount of the account receivables for work in progress as of the date of the Maniktala agreement, July 12, 1993.

Contemporaneous with the above efforts, Sargent, Webster also sought to reduce the tax assessment on its office building and market the same for sale. Hawley E. Van Swall ("Van Swall"), a real estate appraiser and broker with approximately fifty years of experience, testified on direct examination by Goldberg that on July 12, 1993, he submitted an appraisal of Sargent, Webster's office building to the general partners. *See* Debtors' Exhibit "B" (Van Swall Appraisal). Van Swall testified that the fair market value of the office building in July 1993 was $610,000. *See id.* Although the parties failed to specify a date, sometime in July 1993 Sargent, Webster also entered into an agreement with The John Lynch Company, a real estate brokerage firm. Pursuant to this agreement, The John Lynch Company was given authority to market the partnership's office building for $600,000. *See also* Debtors' Exhibit "R" (Exclusive Listing Agreement with The John Lynch Company).

J. Scott Finlay, Esq. ("Finlay"), an attorney with the law firm of Menter, Rudin & Trivelpiece, P.C., testified on direct examination by Goldberg that he received a call from Markley towards the end of July 1993. Finlay, who specializes in debtor-creditor relations, testified that he initially met with Siddell and Markley to discuss the partnership's affairs on July 26, 1993. Finlay stated that at the July 26 meeting Debtors advised him of the partnership's asset base and the indebtedness owed to OnBank. Finlay testified on direct examination that at the time of the July 26 meeting he believed OnBank was an oversecured creditor.

Finlay further testified that he advised Debtors that because Sargent, Webster had not satisfied its last payroll obligation, there were significant trust fund liabilities with possible criminal repercussions for the individual partners. As such, Finlay suggested that the partnership consider opening a bank account at an institution other than OnBank and to deposit proceeds received by the partnership into the account. On cross-examination by Levine, Finlay acknowledged that he "encouraged" the partners to pay Sargent, Webster's employees from this new account. Finlay admitted that both Siddell and Markley did not intend to injure OnBank and, in fact, inquired as to the propriety of opening a new account and making payments to employees from the same.

Debtors next met with Finlay on August 2 and, thereafter, on August 10, 1993. Siddell testified that the August 10 meeting with Finlay included discussions about opening a new account. Later that day, August 10, 1993, the partners held a special partnership meeting and unanimously approved the opening of a checking account in Sargent, Webster's name at Chase Lincoln First Bank, N.A., in Syracuse, New York ("Chase"). *See* OnBank's Exhibit "13" (Partnership Resolution). The Chase account was opened on August 10, 1993 and Debtors were the only authorized signatories on the account. *Id.; see also* OnBank's Exhibit "14" (signature cards).

Siddell testified that the initial deposits into the Chase account came by way of liquidating partnership insurance policies upon which OnBank held no assignment or lien. The proceeds from the insurance policies were approximately $66,000. OnBank alleges that Debtors also deposited at least $51,910.07 into the Chase account consisting of proceeds of account receivables, equipment, general intangibles or other property which was the subject of OnBank's security interest ("OnBank proceeds"). *See* OnBank's Exhibit "15" (Record of Deposits). Siddell testified that Sargent, Webster received the OnBank proceeds from clients who, despite being advised of the Lockbox agreement, did not forward payments to the same.

Siddell testified that the partners always advised Finlay prior to making any deposits into or withdrawals from the Chase account. Siddell also admitted on cross-examination by Levine that Finlay advised the partners not to reveal to OnBank that Sargent, Webster had opened the Chase account. Both Debtors, Siddell and Markley, testified that when the Chase account was opened, they believed that the obligation to OnBank would be fully satisfied from the sale proceeds of the partnership's office building and the outstanding account receivables.

The Chase account was debited 25 times between August 23, 1993 and December 23,

1993. *See* OnBank's Exhibit "16" (Record of Disbursements). OnBank alleges that Sargent, Webster paid less than $51,000 from the Chase account for purposes of payroll and payroll taxes. *Id.* OnBank alleges that most of the Chase account was disbursed to non-priority unsecured creditors and professionals. *Id.*

Siddell testified that the partners met with Finlay again on September 2, 1993. At this meeting the partners presented Finlay with an aging report of outstanding account receivables as of July 8, 1993. *See* Debtors' Exhibit "S". The report indicated that Sargent, Webster had account receivables, excluding work in progress which had been assigned to Maniktala, of $462,583.31.

On or about December 10, 1993, OnBank entered a judgment against Sargent, Webster in New York State Supreme Court, Onondaga County for $562,588.06. *See* OnBank Exhibit "12". The judgment amount included the sums owed pursuant to the Sargent, Webster Note for $500,000 and the Sargent, Webster guaranty of the Richard and Lynn–Dell Dore Note of $50,000. Thereafter, on December 28, 1993, Siddell executed a petition for relief under Chapter 7 in the name of Sargent, Webster.

By Order dated January 6, 1994, Michael J. Balanoff, Esq. ("Balanoff"), was appointed by this Court as the Chapter 7 Trustee in Sargent, Webster's bankruptcy case. Balanoff testified on direct examination by Levine that following this Court's approval, the partnership's office building was sold for $208,000 on or about September 6, 1994. *See* OnBank Exhibit "48" (Statement of Sale). Balanoff stated that OnBank received approximately $133,855.95 from the sale proceeds.

Balanoff also testified that the Chase account was turned over to the bankruptcy estate. Balanoff stated that although he took the position that OnBank did not have a claim to the Chase account proceeds, he agreed to a settlement with OnBank in order to avoid litigation. Balanoff explained on

cross-examination by Lee E. Woodard, Esq. ("Woodard"), counsel for Markley, that the Chase account contained life insurance proceeds as well as OnBank's collateral. Balanoff determined that it would not be cost effective to litigate which of the commingled proceeds were encumbered by OnBank's lien. Pursuant to the settlement, OnBank received 10% of the Chase account proceeds and 90% remained with the estate.

Siddell and Markley filed for relief under Chapter 7 of the Code on February 1, 1994 and February 2, 1994, respectively. Allegedly, Sargent, Webster's remaining partners, Donald J. Skowron and William M. Chase, also filed for relief under Chapter 7 of the Code.[3]

### DISCUSSION

■■■ In seeking to have a debt deemed to be nondischargeable pursuant to Code §§ 523(a)(4) and (a)(6), OnBank must establish the elements of each cause of action by a preponderance of the evidence. *See In re Wolfson,* 139 B.R. 279, 285 (Bankr.S.D.N.Y. 1992), *aff'd,* 152 B.R. 830 (S.D.N.Y.1993) (citing *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)). Furthermore, exceptions to discharge are to be narrowly construed in favor of a debtor and against the creditor to effectuate the fresh start purposes of the bankruptcy laws. *See In re Verdon,* 95 B.R. 877, 882 (Bankr.N.D.N.Y. 1989).

The Court begins by addressing two affirmative defenses interposed by Debtors. First, Debtors allege that they are not the proper parties in interest. *See* Siddell's First Amended Answer at ¶ 11; Markley's First Amended Answer at ¶ 11. Second, Debtors allege that OnBank has failed to join an indispensable party, presumably, the Chapter 7 Trustee in Sargent, Webster's bankruptcy case. *Id.* at ¶ 12.

■■■ When a partnership files for relief under Chapter 7 of the Code, the partnership trustee may seek contributions from the gen-

---

3. Debtors allege, without specifying dates, that Donald J. Skowron filed his Chapter 7 in the Western District of New York and William Chase filed his Chapter 7 in the District of Arizona. *See* Debtors' September 25, 1995, Memorandum of Law at 10. Debtors further allege that there is an adversary proceeding against Donald J. Skowron which "has been held pending the ultimate decision in the Siddell and Markley matters ..." *Id.*

eral partners. *See* Code § 723(a). However, when an individual partner files for bankruptcy, the partnership trustee can reach that individual only through the shield of protections afforded to the debtor-partner by the Code. *See* Code § 723(c). Code § 723(c) provides the partnership trustee a means of collecting from a debtor-partner on behalf of the partnership creditors. *See In re Lamb*, 40 B.R. 689, 692 (Bankr.E.D.Tenn. 1984) ("Section 723 simply provides one means of collecting from a partner on behalf of the partnership's creditors.") The partnership trustee simply becomes a general creditor in the debtor-partner's estate, sharing equally with the partner's separate creditors in the distribution of proceeds. However, as the court noted in *In re Lamb*, "There is nothing about a partnership's bankruptcy and a trustee's judgment under § 723 against one of the partners that deprives the partnership's creditors of their individual 'claims' against the partner." *Id.* (emphasis in original); *compare In re Betz*, 64 B.R. 248, 252 (Bankr.N.D.Ohio 1986).

██ Federal Rules of Bankruptcy Procedure ("Fed.R.Bankr.P.") 4007 provides that a "debtor or any creditor" may file a complaint under Code § 523. "Creditor", in turn, is defined as an "entity that has a *claim* against the debtor that arose at the time of or before the order for relief concerning the debtor." Code § 101(10) (emphasis added). As OnBank is not deprived of its "claim" against either Siddell or Markley, OnBank is a creditor for purposes of filing a Code § 523 cause of action.

██ As noted above, the partnership trustee is simply a statutory assignee with the duty of enforcing the partnership creditors' claims for *purposes of collection. See In re Lamb, supra*, 40 B.R. at 692 (Code § 723 provides orderly means of collection). The statutory assignment does not deprive the partnership creditors of their substantive rights against the debtor-partner or his estate. *Compare In re Betz, supra*, 64 B.R. at 252. As such, OnBank is not deprived of its substantive right to determine the dischargeability of a debt owed by Markley and Siddell, former partners of Sargent, Webster. Furthermore, because a Code § 523 cause of

action is not determinative as to the collectability of a debt, but merely the dischargeability of an obligation, Balanoff, the Chapter 7 Trustee in Sargent, Webster's bankruptcy case, was neither an indispensable nor necessary party to the instant adversary proceedings. *See e.g. In re Silba*, 170 B.R. 195, 199 n. 2 (Bankr.E.D.N.Y.1994) (distinguishing the concept of dischargeability from an objection to the allowance or collectability of a claim).

The Court next addresses OnBank's Code § 523(a)(4) cause of action. By its own terms, Code § 523(a)(4) makes debts for fraud or defalcation nondischargeable only if the debtor was acting as a fiduciary. Debts for larceny and embezzlement, in contrast, are nondischargeable regardless of the debtor's fiduciary capacity.

██ When determining the dischargeability of a debt under Code § 523(a)(4), "[t]here is no need to consider whether debtor has committed 'fraud or defalcation' unless it is first determined that debtor was 'acting in a fiduciary capacity'." *In re Turner*, 134 B.R. 646, 648 (Bankr.N.D.Okl.1991). It is well established that although state law can be consulted, determining whether the debtor was acting in a fiduciary capacity is a matter of federal law. *See In re Sawyer*, 112 B.R. 386, 389 (Bankr.D.Colo.1990) (citations omitted); *In re Gans*, 75 B.R. 474, 489 (Bankr.S.D.N.Y.1987) (citations omitted).

██ The term "fiduciary capacity", as defined by federal law, only applies to technical trusts, express trusts, or statutorily imposed trusts and not to relationships resulting in equitable trusts. *In re Gans, supra*, 75 B.R. at 489; *see also Joy v. Megeed (In re Megeed)*, Ch. 7 Case No. 91–00772, Adv. No. 91–60151A, slip op. at 6–8 (Bankr.N.D.N.Y. July 16, 1992). The definition of a fiduciary is narrowly construed so that it does " 'not reach commercial debtor-creditor transactions in which the debtor merely violated the terms of his agreement with the creditor.' " *In re Gans, supra*, 75 B.R. at 489 (quoting *In re Levitan*, 46 B.R. 380, 385–386 (Bankr. E.D.N.Y.1985)).

OnBank has not alleged a statute under which Debtors would be deemed fiduciaries for purposes of Code § 523(a)(4). OnBank,

instead, argues that an express fiduciary obligation was undertaken by Siddell and Markley pursuant to the Lockbox agreement and July 6 letter. *See* OnBank's August 16, 1995, Memorandum of Law at 12. OnBank alleges that Debtors had a duty to deliver to OnBank "all the proceeds of the Sargent, Webster accounts and other secured property." *Id.*

■■■ As a general rule an express or technical trust is created by an agreement between the parties to impose a trust relationship. *In re Gans, supra,* 75 B.R. at 489; *compare In re Long,* 774 F.2d 875 (8th Cir. 1985) (court found agreement requiring debtor corporation to place proceeds from accounts receivable in segregated account payable to creditor more contractual than fiduciary); *with In re Eisner,* 35 B.R. 86, 89 (Bankr.N.D.Ohio 1983) (without offering reasoning the court stated that, "There is no question in the Court's mind that the debtor was acting in a fiduciary capacity ... when he was diverting the moneys ... from the lock box account ..."). However, OnBank's July 6 letter, which was issued to both Sargent, Webster and Maniktala, expressly states that the Lockbox agreement did not create "a partnership, joint venture or any other relationship of agency or concerted action of the Bank [OnBank] with either Sargent and/or Maniktala." OnBank Exhibit "11" at ¶ f. Given this express denial of a trust relationship by the creditor itself and the general rule that the concept of fiduciary is to be narrowly construed, the Court finds that OnBank has not met its burden of proof as to establishing that Debtors acted in a fiduciary capacity.

■■■ The Court next focuses its attention on the "non-fiduciary debts" of Code § 523(a)(4) and OnBank's Code § 523(a)(6) cause of action. Embezzlement has been defined as " 'the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.' " *In re Goux,* 72 B.R. 355, 359 (Bankr.N.D.N.Y.1987) (quoting *Moore v. United States,* 160 U.S. 268, 269, 16 S.Ct. 294, 295, 40 L.Ed. 422 (1895)). Larceny is to be distinguished from embezzlement in that larceny involves the *"wrongful* taking

or carrying away of the property of another with intent to convert such property to his use without the consent of the owner." *In re Langworthy,* 121 B.R. 903, 907 (Bankr. M.D.Fla.1990) (citations omitted) (emphasis added). Thus, larceny differs from embezzlement only in that the original taking was unlawful. *See In re Dempster,* 182 B.R. 790, 802 (Bankr.N.D.Ill.1994). To prove embezzlement or larceny, OnBank must demonstrate that Debtors used the OnBank proceeds for their own benefit and did so with fraudulent intent. *Id.; In re Kelly,* 155 B.R. 75, 78 (Bankr.S.D.N.Y.1993).

■■■ This Court has previously noted that a Code § 523(a)(4) cause of action mirrors a Code § 523(a)(6) claim alleging that there has been a willful and malicious conversion of funds in that both analyses focus on the intent of the debtor. *See James L. Glenn v. Clifford D. Hrim (In re Hrim),* Ch. 7 Case No. 92–62796, Adv. No. 92–70206A, slip op. at 13 (Bankr.N.D.N.Y. September 30, 1993) (citing *In re Cook,* 146 B.R. 934, 944 (Bankr. E.D.Penn.1992) (citations omitted)); *see also In re Contella,* 166 B.R. 26, 30 (Bankr. W.D.N.Y.1994) (court found plaintiff failed to establish requisite scienter for purposes of Code § 523(a)(4) for the same reasons that precluded finding of willfulness and malice under Code § 523(a)(6)). The Court noted in *Hrim* that a Code § 523(a)(4) and (a)(6) claim both require that, "Not only must the Plaintiff [creditor] establish that the Debtor used the proceeds to pay other debts than that owed Plaintiff, he must also show *fraudulent* intent." *In re Hrim, supra,* slip op. at 13 (citing *In re Weber,* 892 F.2d 534, 539 (7th Cir.1989)) (emphasis in original). As such, the failure to establish the debtor's fraudulent intent by a preponderance of the evidence will result in the dismissal of the non-fiduciary Code § 523(a)(4) and (a)(6) claims.

OnBank alleges that pursuant to the terms of the Lockbox agreement, Debtors had expressly agreed that Sargent, Webster would forward all proceeds from account receivables, aside from those assigned to Maniktala, to the Lockbox account. OnBank argues that Debtors demonstrated the requisite fraudulent intent by opening the Chase account and depositing OnBank proceeds into

the same without the knowledge or consent of OnBank. OnBank further argues that Debtors "acted intentionally and with the knowledge that the monies which they [Debtors] deposited into and disbursed out of the Chase account would never be recovered by plaintiff [OnBank]." *See* OnBank's August 16, 1995, Memorandum of Law at 11.

██ The Court's focus in determining whether fraudulent intent existed is on Debtors' acts and the context in which they occurred. *See Matter of Rose,* 934 F.2d 901, 904 (7th Cir.1991) (intent may properly be inferred from totality of circumstances and conduct of accused); *In re Kaiser,* 722 F.2d 1574, 1582 (2d Cir.1983). Both Debtors testified that at the time the Chase account was opened on August 10, 1993, they believed that the obligation owed to OnBank would be fully satisfied. The obligation owed to OnBank on or about August 1993 was approximately $550,000. *See also* OnBank's Exhibit "12" (December 10, 1993, New York State Supreme Court Judgment against Sargent, Webster for $562,588.06). This obligation was comprised of Sargent, Webster's guaranty of Richard and Lynn–Dell Dore's Note of $50,000 and a Note executed and delivered by Sargent, Webster on or about December 23, 1992, for $500,000.

██ Debtors testified that they believed that the debt owed to OnBank would be satisfied from the sale proceeds of Sargent, Webster's office building and the outstanding account receivables. Debtors testified that on or about August 1993 the office building had a value of approximately $600,000. Debtors' valuation was based on an appraisal by Van Swall, a real estate appraiser with 50 years of experience. Van Swall testified that he valued Sargent, Webster's office building on July 12, 1993, at $610,000. *See* Debtors' Exhibit "B". The office building was also put on the market for sale by The John Lynch Company sometime in July 1993 for $600,000. The Court notes that Balanoff, the Chapter 7 Trustee in Sargent, Webster's bankruptcy case, testified on direct examination by Levine that the partnership's office building was eventually sold on or about September 6, 1994, for $208,000. *See also* OnBank's Exhibit "48" (Statement of Sale).

The Court concludes, however, that because Van Swall's testimony concerned an appraisal on or about the time of the alleged fraud, it is more probative than Balanoff's testimony with respect to establishing what Debtors reasonably believed the value of the office building to be in August 1993.

Debtors further testified that they thought the outstanding account receivables as of July 8, 1993, excluding those assigned to Maniktala, were approximately $462,583.31. *See also* Debtors' Exhibit "S" (Report of Account Receivable). The Court found Debtors' testimony to be both credible and consistent with the other evidence presented.

Young, Maniktala's chief accountant, bolstered Debtors' credibility by testifying that prior to the Maniktala agreement he had reviewed Sargent, Webster's financial records. Young concluded that Sargent, Webster's analysis for accounts receivable for work in progress was "slightly optimistic but I didn't think it was out of the ballpark."

Pierie's testimony also supports a conclusion that Debtors' conduct is susceptible to a more innocent interpretation than that proposed by OnBank. Pierie, an OnBank loan administrator, testified on cross-examination by Goldberg that in June 1993 he believed that Sargent, Webster had outstanding account receivables of approximately $700,000. In addition, Pierie testified that on or about October 28, 1992, OnBank had commissioned an appraisal of the partnership's office building which valued it at $790,000. *See* Debtors' Exhibit "A". Pursuant to Pierie's testimony the Court finds that Debtors were not unreasonable in believing that OnBank's obligations were fully secured by the accounts receivable and the office building and, as such, the debt to OnBank would be retired.

Debtors' conduct immediately preceding the opening of the Chase account also did not evince an intent to defraud OnBank. For example, Debtors met with OnBank representatives on several occasions, including June 22, 1993. Following the June 22 meeting, Sargent, Webster entered into a Lockbox agreement which was also dated June 22, 1993. *See* OnBank's Exhibit "10" (Lockbox agreement). Pursuant to the terms of the Lockbox agreement, Debtors informed Sar-

gent, Webster's clients to forward all receivable payments to the Lockbox. *See* Debtors' Exhibits "H", "I", "J", and "K" (Sargent, Webster letters to clients).

Debtors explained that notwithstanding the Lockbox agreement they opened the Chase account and deposited OnBank proceeds into it in order for Sargent, Webster to meet its last payroll obligation. Debtors testified that Sargent, Webster's counsel, Finlay, explained to them in a meeting on or about July 26, 1993, that the failure to meet payroll obligations may result in criminal sanctions for the individual partners.

■ The Court notes that there is a split of authority as to whether the reliance on advice of counsel is a proper defense to rebut fraudulent intent. *Compare In re Sausser,* 159 B.R. 352, 356 (Bankr.M.D.Fla.1993) (advice of counsel is not an adequate defense) (citation omitted); *with In re Cheek,* 157 B.R. 1003 (Bankr.E.D.Mo.1993) (intent is lacking when debtor acts in good faith upon advice of counsel). This Court concludes that because fraudulent intent is inferred from the totality of circumstances, reliance on advice of counsel may be considered as a factor in determining intent. As such, where the debtor's reliance is reasonable and in good faith, "the advice of counsel may ... negate the inference of fraudulent intent." *In re Nazarian,* 18 B.R. 143, 147 (Bankr.D.Md.1982); *see also In re Kelly,* 135 B.R. 459, 462 (Bankr. S.D.N.Y.1992); *In re Bateman,* 646 F.2d 1220 (8th Cir.1981) (reliance must be reasonable); *In re Adeeb,* 787 F.2d 1339, 1343 (9th Cir.1986) (good faith reliance required).

The Court finds that Debtors' reliance on Finlay's advice was both reasonable and in good faith. Finlay, an attorney at Menter, Rudin & Trivelpiece, P.C. specializing in debtor-creditor relations, acknowledged that he "encouraged" Debtors to establish a new account in Sargent, Webster's name at an institution other than OnBank. Finlay further testified that when he advised Debtors to pay Sargent, Webster's employees from the new account he believed that OnBank was an oversecured creditor. Finlay stated that his opinion was based on his review of the partnership's asset base and the indebtedness owed to OnBank. Finlay also testified that Siddell and Markley did not intend to injure OnBank and, in fact, inquired as to the propriety of opening the Chase account. Siddell testified that the partners always advised Finlay prior to making any deposits into or withdrawals from the Chase account.

After a careful review of the considerable record established in the instant adversary proceedings, the Court concludes that OnBank has not met its burden of proof in order to establish Debtors' fraudulent intent. The Court finds that at the time the Chase account was opened Debtors reasonably believed that OnBank was an oversecured creditor and its debt would be completely retired. As such, OnBank did not establish that when Debtors opened the Chase account and deposited proceeds into the same they were certain or almost certain that it would cause financial harm. Therefore, Debtors did not have the requisite intent to either willfully and maliciously injure OnBank's property or commit embezzlement or larceny.

Based on the foregoing, it is

ORDERED that OnBank's complaint filed pursuant to Code §§ 523(a)(4) and (a)(6) seeking nondischargeability of a debt owed by Debtor Markley is denied, and it is further

ORDERED that OnBank's complaint filed pursuant to Code §§ 523(a)(4) and (a)(6) seeking nondischargeability of a debt owed by Debtor Siddell is likewise denied.